## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **KANE COMMUNICATIONS, LLC,** | ) ) ) | |
| *Plaintiff,* | ) ) | |
| | ) | **Case No.: 3:23-cv-00824-E** |
| **v.** | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **COMPUCOM SYSTEMS, INC.,** | ) ) | |
| *Defendant.* | ) | |

---

## KANE COMMUNICATIONS, LLC'S BRIEF IN SUPPORT OF MOTIONS IN LIMINE

---

Dated:     August 1, 2025

# TABLE OF CONTENTS

I.   SHORT STATEMENT OF NATURE AND
     STAGE OF PROCEEDING ..................................................................1

II.  SUMMARY OF ARGUMENT ...............................................................2

III. STATEMENT OF MATERIAL FACTS ...............................................4

IV.  ARGUMENT ...........................................................................................4

     A.   Legal Standard .............................................................................4

     B.   Motion in Limine No. 1: The Court Should Preclude CompuCom
          from Introducing Dennis Greenawalt's Deposition Testimony
          Regarding Staffing Services Agreements With Industrial Staffing
          Services Inc. d/b/a FieldLink ......................................................5

     C.   Motion in Limine No. 2: The Court Should Preclude CompuCom
          from Introducing Steve Radmann's Deposition Testimony
          Regarding Assessing Penalties on FieldLink ..............................9

     D.   Motion in Limine No. 3: Due to CompuCom's Spoliation of
          Evidence, the Court Should Preclude Testimony Regarding
          Alleged Re-Work ......................................................................13

     E.   Motion in Limine No. 4: The Court Should Preclude CompuCom
          Witnesses from Offering Opinion Testimony Regarding Whether
          Kane's Work Complied With Installation Instructions and
          Specifications for Type of Cable to Be Used or Industry
          Standards ...................................................................................18

     F.   Motion in Limine No. 5: The Court Should Preclude CompuCom's
          Project Managers Ron Benco and Sai Vang from Testifying as
          Their Testimony Is Needlessly Cumulative ..............................20

V.   CONCLUSION ......................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Aetna Cas. & Sur. Co. v. Guynes*,
　　713 F.2d 1187 (5th Cir. 1983) ...................................................................4, 5

*Ashton v. Knight Transp., Inc.*,
　　772 F. Supp. 2d 772 (N.D. Tex. 2011) ...................................................14, 15

*Coastal Bridge Co., L.L.C. v. Heatec, Inc.*,
　　833 F. App'x 565 (5th Cir. 2020) ..................................................................15

*Guzman v. Jones*,
　　804 F.3d 707 (5th Cir. 2015) .........................................................................17

*Jim S. Adler, P.C. v. McNeil Consultants, LLC*,
　　No. 3:19-cv-2025-K-BN,
　　2023 WL 2699511 (N.D. Tex. Feb. 15, 2023) .............................................15

*Luce v. United States*
　　469 U.S. 38 (1984) ...........................................................................................4

*O'Rear v. Fruehauf Corp.*,
　　554 F.2d 1304 (5th Cir. 1977) .........................................................................4

*United States v. Breland*,
　　366 F. App'x 548 (5th Cir. 2010) ..................................................................19

*Washington v. Dep't of Transp.*,
　　8 F.3d 296 (5th Cir. 1993) .............................................................................11

*White v. Walker*,
　　950 F.2d 972 (5th Cir. 1991) ....................................................................11, 12

## Rules

Fed. R. Evid. 402 ....................................................................................................12

Fed. R. Evid. 403 .................................................................................4, 9, 12, 13, 21

Fed. R. Evid. 602 ..................................................................................7, 8, 10

Fed. R. Evid. 701 ....................................................................................11, 18, 19

Fed. R. Evid. 901 ........................................................................................8

**TO THE HON. ADA BROWN, U.S. DISTRICT JUDGE**:

Plaintiff Kane Communications, LLC ("Kane") respectfully files its Motions in Limine, and offers this Brief in Support in accordance with Loc. Civ. R. LR-7.1(d).

## I.    SHORT STATEMENT OF NATURE
## AND STAGE OF PROCEEDING

This case presents claims arising out of a construction contract. Specifically, Kane alleges that Defendant CompuCom Systems, Inc. ("CompuCom") breached the parties' contract and violated the Texas Prompt Payment Act by not paying Kane's outstanding invoices and by wrongfully terminating the contract. CompuCom has asserted Counterclaims alleging that Kane breached the contract, which Kane believes to be meritless. The Parties have completed all discovery and Kane has filed a Motion for Summary Judgment and a Motion *in Limine* Objecting to Phil Isaak as an Expert Witness, both of which are currently pending with the Court. Trial is scheduled to commence on August 18, 2025. In accordance with the Court's July 24, 2025 Text Order (Doc. 133), Kane now timely files its Motions in Limine.

## II.    SUMMARY OF ARGUMENT

Kane submits Motions in Limine on five discrete topics in this matter.

First, the Court should preclude CompuCom from introducing Kane's witness, Dennis Greenawalt's deposition testimony regarding the terms of agreements between Kane (and Kane's affiliate) and a subcontractor, FieldLink, as well as the agreements themselves.  Mr. Greenawalt lacks personal knowledge as to the agreements and CompuCom did not lay a proper foundation at the deposition for Mr. Greenawalt to authenticate the agreements.

Second, the Court should preclude CompuCom from introducing Kane's witness, Steve Radmann's deposition testimony regarding whether it would have been appropriate, had CompuCom assessed penalties against Kane, for Kane to similarly assess penalties against FieldLink.  CompuCom did not establish that Mr. Radmann had any personal knowledge as to the terms of the agreements with FieldLink.  Moreover, Mr. Radmann testified that CompuCom never assessed penalties against Kane, making the question purely hypothetical and the testimony inadmissible lay opinion.

Third, due to CompuCom's spoliation of evidence, the Court should preclude CompuCom from offering any testimony on re-work by the replacement subcontractors.  CompuCom was aware that it would be seeking to recover costs to remediate defective work.  As such, as of that date, CompuCom had a duty to

preserve evidence of the alleged defective work.  Yet, CompuCom breached that duty by having the replacement subcontractors perform the re-work without memorializing the conditions prior to the re-work in any way.  As a result, Kane would be prejudiced if CompuCom were able to offer witnesses to testify to the conditions requiring re-work, in that Kane would not be able to offer testimony in rebuttal as no photographic evidence of the conditions exist.

Fourth, the Court should preclude CompuCom from offering any lay opinion testimony on whether Kane's work complied with installation instructions, specifications for type of cable to be used, regulations, codes, or industry standards. By engaging an expert witness to opine in these areas, CompuCom necessarily must concede that the opinions require specialized knowledge.  Thus, if such testimony is to be offered, it must be that of a qualified expert witness, and not an ordinary fact witness.

Fifth, the Court should preclude CompuCom's project managers, Ron Benco and Sai Vang, from testifying.  The testimony of these witnesses would be duplicative of the testimony of another project manager, Ron DeLand, who CompuCom expects to call.  Given the representation by counsel to the Court that the trial may take up to eight days, and the number of witnesses that CompuCom has identified, the testimony of Mr. Benco and Mr. Vang would only serve to waste time and needless present cumulative evidence.

### III.    STATEMENT OF MATERIAL FACTS

Kane hereby incorporates its Summary of its Affirmative Claims and Defenses, Stipulated Material Facts, and its Contested Material Facts[1] contained within the Joint Pretrial Order submitted as of the date of these Motions.

### IV.    ARGUMENT

#### A.    Legal Standard

A party may use a motion in limine to exclude inadmissible or prejudicial evidence before it is actually introduced at trial, which also helps avoid length arguments at, or interruptions of, trial. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). In that regard, the Court should grant a motion in limine where the evidence would be highly prejudicial to the moving party and a motion to strike or an instruction by the court would not overcome the prejudicial influence. *See, e.g., O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977).

The Court may exclude relevant evidence if its probative value is substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. Further, it is within the Court's discretion to limit the number of witnesses who

---

[1] As stated in the Joint Pretrial Order, while Kane included certain contested facts in the Joint Pretrial Order, Kane does not believe that there exist any issues of material fact and for the reasons set forth in its Motion for Summary Judgment, Kane is entitled to judgment as a matter of law.

testify at trial on the basis of cumulation. *See Aetna Cas. & Sur. Co. v. Guynes*, 713 F.2d 1187, 1193 (5th Cir. 1983).

> **B.    Motion in Limine No. 1: The Court Should Preclude CompuCom from Introducing Dennis Greenawalt's Deposition Testimony Regarding Staffing Services Agreements With Industrial Staffing Services Inc. d/b/a FieldLink.**

Throughout this case, CompuCom has focused on Kane's use of subcontracted labor to perform portions of the work on the Projects. In that regard, CompuCom has raised an issue as to the qualifications of the subcontractors, which Kane believes to be without merit. Specifically, CompuCom was aware that Kane was using subcontracted labor during the Projects and never objected. Nor did CompuCom cite Kane's use of subcontracted labor as a basis for terminating Kane. Regardless, during this litigation, CompuCom has contended that Kane's use of subcontracted labor violated the SOWs.

Industrial Staffing Services Inc. d/b/a FieldLink ("FieldLink") was one of the entities with whom Kane subcontracted. During the deposition of Kane's Director of Business Operations, Dennis Greenawalt, CompuCom's counsel asked Mr. Greenawalt a number of questions regarding the terms of the Staffing Services Agreements between Kane and FieldLink (the "Kane-FieldLink Agreement") and Kane's affiliate, Cable Solutions, LLC, and FieldLink (the "Cable Solutions-FieldLink Agreement) (collectively, the "Agreements"). In its Pretrial Disclosures (Docs. 123, 123-1, 123-2, 123-3), CompuCom has designated this testimony from

Mr. Greenawalt's deposition for use at trial (Pg:Ln 165:16-166:05, 166:16-167:25, 168:12-169:3) (A2-A3), and has identified the Agreements themselves as exhibits (Greenawalt Exhibits 8, 9, 10) (A4-A13).

However, Mr. Greenawalt is not a signatory to the Agreements. The Agreements are all signed by Ryan Kasten on behalf of Kane and Cable Solutions,. Moreover, Mr. Greenawalt did not specifically recall seeing the Agreements previously. In that regard, he testified to the following regarding the Cable Solutions-FieldLink Agreement:

> Q. I'm going to mark, as Exhibit 8, this document. Let me share my screen.
> All right. So what I've marked as Exhibit 8 is titled FieldLink Staffing Services Agreement. Have you seen this document or a document similar to this before?
>
> A. I'm assuming I have.
>
> Q. Okay.
>
> A. But I don't specifically – I mean, it probably came through an email and I – and I – and I forwarded on to our legal and – on that team.

(A2, Greenawalt Dep. Tr., 165:16-166:1).

With regard to Greenawalt Exhibit 9, an addendum to the Cable Solutions-FieldLink Agreement, and Greenawalt Exhibit 10, the Kane-FieldLink Agreement, CompuCom's counsel did not ask Mr. Greenawalt whether he had seen either document before. And while Mr. Greenawalt answered certain questions about the

content of Greenawalt Exhibit 9, CompuCom did not establish that Mr. Greenawalt had any personal knowledge of the document.

Regarding the Kane-FieldLink Agreement, Mr. Greenawalt provided the following testimony:

> Q. All right.    This is another FieldLink Staffing Services Agreement, but the difference is this one is with Kane Communications.    You see that?
>
> A. Yes, I see it.
>
> Q. This looks like it was also signed by Mr. Kasten right around the end of December of 2021.  Do you know if FieldLink had a relationship with Kane or Kane Communications before this?
>
> A. No, I don't know.
>
> Q. Okay.  Is the reason that there would need to be a separate staffing services agreement – I guess that's because Cable Solutions and Kane Communications are two separate entities?
>
> A. That is my assumption.
>
> . . .
>
> A. I don't know.

(A2-A3, Greenawalt Dep. Tr. 168:15-169:5).

Based on Mr. Greenawalt's testimony, he is not a competent witness to testify regarding the Agreements.  Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding

that the witness has personal knowledge of the matter."  Here, there is no evidence that Mr. Greenawalt has personal knowledge regarding the Agreements.  In that regard, CompuCom did not lay any foundation to support such a finding.  Indeed, Mr. Greenawalt could not specifically recall ever having seen the Cable Solutions/FieldLink Agreement.  Nor did he know what led to the creation of the Kane/FieldLink Agreement.  Thus, Mr. Greenawalt's testimony regarding the agreements is inadmissible and the Court should exclude it.

Further, CompuCom cannot authenticate the Agreements through Mr. Greenawalt.  Federal Rule of Evidence 901 permits a party to authenticate an item of evidence through multiple means.  Most applicable here, an item of evidence can be authenticated through witness testimony provided that the testimony is of a witness with knowledge.  *See* Fed. R. Evid. 901(b)(1).  But CompuCom did not establish that Mr. Greenawalt has any knowledge of the Agreements as set forth above.

An item of evidence can also be established through nonexpert opinion testimony about handwriting.  *See* Fed. R. Evid. 901(b)(2).  But CompuCom's counsel did not ask Mr. Greenawalt during his deposition whether he recognized Mr. Kasten's signature on the Agreements.

Further, an item of evidence can be identified through distinctive characteristics.  *See* Fed. R. Evid. 901(b)(4).  Yet, CompuCom's counsel did not ask

Mr. Greenawalt any questions during the deposition as to whether there were any distinctive characteristics of the Agreements, such as FieldLink's logo.

In sum, CompuCom has not met the standard for authenticating the Agreements. It was CompuCom's burden to ask Mr. Greenawalt necessary questions to authenticate the Agreements it now seeks to introduce as exhibits at trial. However, CompuCom failed to do so. As such, the Court grant Kane's First Motion in Limine and exclude the Agreements and all of Mr. Greenawalt's testimony regarding the Agreements. Allowing a witness with no personal knowledge to opine on or summarize the terms of agreements he cannot authenticate risks misleading the jury into accepting inaccurate or unsupported contract terms. This is precisely the kind of evidentiary confusion and prejudice that Rule 403 is designed to avoid.

### C. Motion in Limine No. 2: The Court Should Preclude CompuCom from Introducing Steve Radmann's Deposition Testimony Regarding Assessing Penalties on FieldLink.

During the deposition of Kane's Estimator, Steve Radmann, CompuCom's counsel asked certain questions regarding a September 7, 2022 internal Kane email wherein Mr. Radmann communicated that if CompuCom were to assess penalties against Kane for not updating its entries in SmartSheets, Kane would pass through the penalties to FieldLink. (A14-A15). As is pertinent to this Motion, Mr. Radmann testified that CompuCom never assessed penalties as follows:

Q. Okay. So the penalties for not properly recording work completed in a daily tech workbook, your understanding was that there was going to be fines assessed from CompuCom to Kane?

A. Yes.

Q. Okay.

A. I believe, yeah.

Q. And you're saying here in the e-mail to Mr. Russo and Schiano that those fines are being passed down from Kane to Fieldlink?

A. If they were enforced, yes.

Q. Okay.

A. Which they never were. Nobody ever – not that I'm aware of. No fines were ever enforced on either organization or any – that I'm aware of.

(A17-A19; Radmann Dep. Tr., 258:10-24).

CompuCom's counsel then asked Mr. Radmann whether he believed it to be fair that if CompuCom were to penalize Kane, then Kane could similarly penalize FieldLink. (A18-A19; Radmann Dep. Tr., 259:17-260:7). Mr. Radmann testified that he believed it was appropriate or fair. (A18-A19; Dep. Tr., 259:17-260:7). CompuCom has designated this portion of Mr. Radmann's deposition for use at trial.

However, Mr. Radmann's testimony is inadmissible for multiple reasons and the Court should exclude it. Initially, pursuant to Federal Rule of Evidence 602, CompuCom's counsel did not introduce any evidence to support a finding that Mr.

Radmann has personal knowledge as to the terms of the Agreements. Given that Kane's and FieldLink's relationship is governed by a written agreement, in order for Mr. Radmann to testify as to whether it was appropriate for Kane to pass through penalties from CompuCom to FieldLink, Mr. Radmann would have had to be familiar with the terms of the Agreements. But CompuCom did not procure any testimony from Mr. Radmann during the deposition to this effect.

In addition, because Mr. Radmann testified that CompuCom never assessed penalties against Kane, the question whether it would have been appropriate for Kane to pass through penalties to FieldLink is purely hypothetical and is not proper lay opinion testimony. Under Federal Rule of Evidence 701, in order for a lay witness to provide opinion testimony, the opinion must be "rationally based on the witness's perception" as well as "helpful to clearly understanding the witness's testimony or to determining a fact in issue."

The Fifth Circuit has recognized that opinion testimony in response to hypothetical questions is speculative in nature, and not rationally based on the witness's perception. *See, e.g., Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) (affirming exclusion of lay witness testimony in products liability action based on failure to warn pertaining to questions as to what witness would have done had he seen warning label); *White v. Walker*, 950 F.2d 972, 979 (5th Cir. 1991) (holding trial court properly excluded deposition testimony consisting of series of

hypothetical questions none of which called for answer "rationally based on the perception of the witness").

Here, Mr. Radmann's testimony as to whether it would have been appropriate for Kane to pass through a penalty from CompuCom to FieldLink was not rationally based on Mr. Radmann's perception, as the situation to which he testified never occurred. CompuCom never assessed a penalty against Kane for missing deliverables in Smartsheets. Therefore, Kane was never in a position to pass through a penalty that it received from CompuCom to FieldLink.

Further, Mr. Radmann's testimony is not helpful to determine a fact at issue. Rather, it only confuses the facts at issue. In that regard, FieldLink's obligations to Kane under the Agreements are not at issue in this case. Instead, Kane's obligations to CompuCom and CompuCom's obligations to Kane are controlled by the terms of their contract. FieldLink's obligations to Kane under the Agreements have no bearing on Kane's claims or CompuCom's counterclaims. Thus, the testimony is not admissible. *See* Fed. R. Evid. 402 ("[i]rrelevant evidence is not admissible").

Finally, even if the testimony could be deemed relevant, and Kane respectfully submits that it cannot, the testimony should nevertheless be excluded because its limited probative value is substantially outweighed by a danger of confusing the issues as set forth above. *See* Fed. R. Evid. 403 ("[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: . . . confusing the issues[.]".  Accordingly, the Court should grant Kane's Second Motion in Limine and exclude Mr. Radmann's testimony regarding whether he believed it would have been appropriate for Kane to pass through penalties to FieldLink for missing deliverables had CompuCom assessed such penalties against Kane.[2]

### D.    Motion in Limine No. 3: Due to CompuCom's Spoliation of Evidence, the Court Should Preclude Testimony Regarding Alleged Re-Work.

The bulk of the damages CompuCom seeks in its Counterclaims pertains to the cost of re-work, which CompuCom characterizes in its Second Amended Response to Interrogatory No. 15 in Kane's First Set of Interrogatories as "the amounts CompuCom was forced to pay to replacement subcontractors to re-do work that Kane represented it had completed by the time Kane was terminated."  (A35-A36).  However, CompuCom has never identified any specific work items that had to be re-done.  Notably, CompuCom's Semi Ferrante admitted in the errata sheet submitted after his deposition that CompuCom has no records by which it would be able to determine what work a replacement subcontractor performed to re-do Kane's work.  (A38).  While Mr. Ferrante attempted to blame Kane for its inability to do so,

---

[2] Kane does not dispute that CompuCom could have assessed penalties for missing deliverables.  Paragraph 4.v.i. of the SOWs states "Complete Complete Smartsheets task Deliverables, on-time, to plan.  Failure to meet daily, weekly or completion timelines will result in a $500 per week penalty until completed as required for each deliverable."  CompuCom never assessed this penalty against Kane.  The issue in dispute in this case pertains to whether the contract allows for CompuCom to withhold payment from Kane due to missing deliverables where CompuCom's project managers have approved Kane's hours.

CompuCom is seeking damages associated with allegedly defective work. It is CompuCom's burden to prove the existence of such defective work.

Despite CompuCom bearing the burden of proof, CompuCom never memorialized any defective work items that a replacement subcontractor had to re-do. Certainly, CompuCom had the ability to do so. CompuCom could have had its project management team take photographs of all work that had to be re-done, or instructed the replacement subcontractor to do so. However, CompuCom chose not to do so. Moreover, because the purportedly defective work has already been remediated, all evidence memorializing the work has been lost.

However, CompuCom has stated on its witness list accompanying its Pretrial Disclosures that it may call witnesses from the replacement subcontractors, CH Tech LLC, Hawkeye Technologies, and Top Noth Communications LLC. And in its Third Amended Initial Disclosures, CompuCom has stated that these witnesses "have knowledge regarding the state of Kane's work . . . when Kane was terminated in January 2023, and the work necessary to rework and/or finish the low-voltage tasks . . . after Kane was terminated." (A46). Thus, CompuCom may have witnesses from the replacement subcontractors provide testimony as to the re-work necessary. Such testimony would be inappropriate.

CompuCom's failure to preserve evidence constitutes the spoliation of evidence, which this Court has previously defined as "the 'destruction or material

alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011) (internal citations omitted). If the Court finds that there exists a duty to preserve the evidence, a culpable breach of that duty, and resulting prejudice to the other party, the Court may impose an appropriate sanction. *Id.* The "duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Id.* at 800. Further, a party suffers prejudice if the party cannot present "evidence essential to its underlying claim." *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 575 (5th Cir. 2020) (internal citations omitted). And this Court has stated that "generally, courts find prejudice where a party's ability to present its case or to defend is compromised." *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, No. 3:19-cv-2025-K-BN, 2023 WL 2699511, at *9 (N.D. Tex. Feb. 15, 2023) (internal citations omitted).

In the present case, CompuCom knew as of the time it terminated Kane that evidence of re-work was relevant to future litigation. Significantly, in CompuCom's termination letter, it stated "[a]s a direct and proximate result of Kane's breaches, Compucom has incurred, and will continue to incur, damages and expenses, including ***costs required to complete and remediate the work in the SOWs that remains incomplete and/or defective*** . . . ." (A56) (emphasis added). Thus,

CompuCom knew as of the date it terminated Kane, January 10, 2023, that it would be seeking to recover costs to remediate defective work. Therefore, as of that date, CompuCom had a duty to preserve evidence of allegedly defective work that had to be remediated.

CompuCom breached its duty to preserve evidence and allowed replacement subcontractors to perform re-work without memorializing the conditions requiring re-work in any way. Indeed, the only evidence that exists regarding the work that the replacement subcontractors actually performed consists of their entries into SmartSheets. However, those entries do not contain descriptions suggesting that the replacement subcontractors were remediating Kane's work. Nor are there accompanying photographs on SmartSheets suggesting this to be the case.[3] Thus, CompuCom has not preserved evidence of Kane's work that had to be re-done by the replacement subcontractors and is, therefore, in breach of its duty to do so.

Lastly, Kane would be prejudiced in its ability to defend against CompuCom's Counterclaims. Because CompuCom did not memorialize the alleged defective conditions in any way, Kane cannot rebut any testimony as to the conditions and need for re-work. That is, CompuCom could call a witness from one of the

---

[3] While CompuCom has focused extensively on Kane's missing deliverables in terms of photographs of completed work, the replacement subcontractors' SmartSheet entries contain a very limited number of photographs. Notwithstanding the lack of photographs, CompuCom approved the replacement subcontractors' hours. Notably, CompuCom did not reject any of the replacement subcontractors' hours based on the lack of photographs.

replacement subcontractors to testify as to the conditions that existed that it had to correct. However, Kane would not be able to rebut the testimony because it did not have access to the Projects at the time the replacement subcontractors performed the work and no photographic evidence exists of the conditions. As a result, CompuCom's evidence would go unrefuted. Accordingly, Kane would be prejudiced if CompuCom were permitted to present testimony regarding specific conditions in Kane's work that required re-work.

CompuCom had a duty to preserve evidence of Kane's alleged defective work items that required replacement subcontractors to re-work. CompuCom breached that duty by allowing the replacement subcontractors to perform the re-work without memorializing the conditions that existed. Kane would be prejudiced if CompuCom were able to present testimony as to the conditions. Therefore, the Court should grant Kane's Third Motion in Limine and preclude any witness in CompuCom's case-in-chief from testifying as to any alleged defective work conditions that required re-work.[4]

---

[4] The circumstances under which CompuCom failed to preserve evidence are not known to Kane. As such, Kane reserves the right to request from the Court an adverse inference instruction to the extent that the testimony at trial reveals that CompuCom's spoliation of evidence was done in bad faith. *See Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("[w]e permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'") (internal citations omitted).

E.    **Motion in Limine No. 4: The Court Should Preclude CompuCom Witnesses from Offering Opinion Testimony Regarding Whether Kane's Work Complied With Installation Instructions and Specifications for Type of Cable to Be Used or Industry Standards.**

CompuCom has contended that Kane breached the parties' contract by performing its work in a defective manner and, as set forth in the termination letter, this included "[c]abling done incorrectly and not in accordance with installation instructions and specifications for type of cable to be used." (A56). Kane, of course, disputes such contention. Regardless, CompuCom has engaged Phil Isaak as its expert to opine as to whether Kane's "processes were consistent with . . . regulations and codes, and consistent with industry standards." (A63).[5]

By engaging an expert, CompuCom has recognized that this subject matter requires specialized knowledge. Additionally, in Mr. Isaak's May 28, 2024 Amended Report, his analysis is based upon his view, which Kane disputes, that Kane did not comply with industry standards, codes, and Target's installation standards. (A64-A67). As such, it would be inappropriate for a lay witness to offer any similar opinion testimony.

Under Federal Rule of Evidence 701, a lay witness is only able to offer opinion testimony if the opinion is one that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to

---

[5] Kane has filed a Motion In Limine challenging CompuCom's expert's methodology in rendering his opinions and the reliability of those opinions. That motion is currently pending with the Court.

determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  The "distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *United States v. Breland*, 366 F. App'x 548, 552 (5th Cir. 2010) (internal citations omitted).

Here, whether Kane's work complied with industry standards, codes, and installation instructions is not part of the process of reasoning in everyday life.  That is, an ordinary observer is not able to look at an installation of low voltage cabling and determine that it does or does not comply with BICSI and Leviton cabling specifications and applicable codes.  Instead, this is an area mastered by specialists in the field, which CompuCom appears to recognize by offering Mr. Isaak as an expert.

Nevertheless, Kane expects that CompuCom may offer testimony from Semi Ferrante as the author of the termination letter to testify as to the content of the letter and to explain what he meant by the language "[c]abling done incorrectly and not in accordance with installation instructions and specifications for type of cable to be used." (A56).  However, for the reasons set forth above, any testimony in this regard is impermissible lay opinion testimony, as CompuCom has recognized by engaging Mr. Isaak.  Accordingly, the Court should grant Kane's Fourth Motion in Limine

and preclude CompuCom from offering any lay opinion testimony on whether Kane's work complied with installation instructions, specifications for type of cable to be used, regulations, codes, or industry standards.

### F. Motion in Limine No. 5: The Court Should Preclude CompuCom's Project Managers Ron Benco and Sai Vang from Testifying as Their Testimony Is Needlessly Cumulative.

In the witness list accompanying CompuCom's Pretrial Disclosures, CompuCom identified Ron DeLand as a witness it is expected to call. CompuCom also identified Ron Benco and Sai Vang as witnesses it may call. Based on CompuCom's Third Amended Initial Disclosures, it identifies all three individuals the same way as follows:

> [Name] is a CompuCom Project Manager. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform.

(A44-A45).

Based on this identical description, each witness would offer testimony regarding substantially identical subject matter. In the Joint Motion for Special Setting (doc. 114), the parties represented to the Court that the trial "may take up to eight days, though they hope (and endeavor) to conclude in six or seven days." CompuCom's naming nine witnesses it expects to call and another eight witnesses

it may call is not conducive to completing the trial in eight days. Nor is the testimony of three witnesses with identical titles having knowledge in identical areas necessary.

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence." CompuCom presenting testimony of three project managers would both waste time and needlessly present cumulative evidence. As such, the Court should grant Kane's Fifth Motion in Limine and preclude CompuCom from calling Ron Benco and Sai Vang as witnesses at trial.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff Kane Communications, LLC, respectfully requests that the Court grant each of its Motions in Limine and enter an Order in the form submitted herewith.

Respectfully submitted,

Dated: August 1, 2025

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

By: _____

SHAWN R. FARRELL
MATTHEW L. ERLANGER
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
(215) 564-1700
sfarrell@cohenseglias.com
merlanger@cohenseglias.com

*Counsel for Plaintiff, Kane Communications, LLC*

**COKINOS | YOUNG, P.C.**

By: *R. Anderson Sessions*
      R. Anderson Sessions
      Texas Bar No. 24090378
      Timothy P. Delabar
      Texas Bar No. 24116273
      One Galleria Tower
      13355 Noel Road, Suite 1375
      Dallas, Texas 75240
      Telephone: (817) 635-3600
      Facsimile: (817) 635-3633
      E-Mail: rasessions@cokinoslaw.com
      E-Mail: tdelabar@cokinoslaw.com

*Local Counsel for Plaintiff/Counter-Defendant, Kane Communications, LLC*

## CERTIFICATE OF WORD COUNT

I, Matthew L. Erlanger, hereby certify that the foregoing *Brief in Support of Motions in Limine* complies with the Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, limiting a brief in support of a motion to 6,250 words. The foregoing Brief contains 4,668 words, which were counted by Microsoft Word 365.

Dated: August 1, 2025          */s/ Matthew L. Erlanger*
                              Matthew L. Erlanger

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing Plaintiff Kane Communications, LLC's Brief In Support Of Motions In Limine was served upon the Defendant in this matter by using the Court's Electronic Case Filing ("ECF") system, which will send an automatic notice of electronic filing to counsel of record for each party, who are all registered ECF users. Delivery of the notice of electronic filing constitutes services of this document as contemplated by Rule 5 of the Federal Rules of Civil Procedure.

August 1, 2025                            */s/R. Anderson Sessions*

Date                                       R. Anderson Sessions

11073982.1 50537-0018

# APPENDIX TO MOTIONS IN LIMINE

## TABLE OF CONTENTS

Transcript from Deposition of Dennis Greenawalt (Excerpt) ....................................1

Exhibit Greenawalt 8 ...................................................................................................4

Exhibit Greenawalt 9 ...................................................................................................8

Exhibit Greenawalt 10 .................................................................................................9

Exhibit Radmann 11...................................................................................................14

Transcript from Deposition of Steve Radmann (Excerpt).......................................16

CompuCom Second Amended Objections and Responses to Kane's First Set of Interrogatories .............................................................................................................20

Errata Sheet to Transcript from Deposition of Semi Ferrante................................38

CompuCom Third Amended Initial Disclosures ......................................................43

CompuCom Notice of Termination Letter................................................................55

Amended Expert Report of Phil Isaak (Excerpt)......................................................59

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3   KANE COMMUNICATIONS LLC      §

 4          Plaintiff/           §
            Counter-defendant §

 5   v.                          §   Civil No. 3:23-cv-00824-E

 6   COMPUCOM SYSTEMS INC.        §
                                  §
 7          Defendant/            §
            Counter-plaintiff §   JURY DEMANDED

 8
 9   _____

10          ORAL AND VIDEOTAPED OF
11              DENNIS GREENAWALT
12               APRIL 7, 2025
13             (Reported Remotely)

14   _____

15
16          ORAL AND VIDEOTAPED DEPOSITION OF DENNIS
17   GREENAWALT, produced as a witness at the instance of the
18   Defendant/Counter-plaintiff, and duly sworn, was taken in
19   the above-styled and numbered cause on the 7th of April,
20   2025, from 10:02 A.M. to 3:43 P.M. CST, before Shelly M.
21   Tucker, CSR in and for the State of Texas, reported
22   remotely by machine shorthand from Hays County, Texas,
23   with the witness appearing remotely from Prescott Valley,
24   Arizona, pursuant to the Federal Rules of Civil Procedure
25   and any provisions stated on the record.
```

Page 2

```
 1          A P P E A R A N C E S
 2
     FOR THE PLAINTIFF/COUNTERDEFENDANT:
 3
         Matthew L. Erlanger
 4       COHEN SEGLIAS PALLAS GREENHALL & FURMAN PC
         1600 Market Street, 32nd Floor
 5       Philadelphia, Pennsylvania 19103
         Tel: 215-564-1700
 6       Fax: 215-564-3066
         merlanger@cohenseglias.com
 7
 8   FOR THE DEFENDANT/COUNTERPLAINTIFF:
 9       James Hatchitt
         WEISBART SPRINGER STORM HATCHITT LLP
10       212 Lavaca Street, Suite 200
         Austin, Texas 78701
11       Tel: 512-652-5780
         Fax: 512-682-2074
12       jhatchitt@wshllp.com
13
     ALSO PRESENT:
14
         Lauren Morris, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
              I N D E X

                                              PAGE
Appearances....................................    2
DENNIS GREENAWALT
   Examination by Mr. Hatchitt.................    5
Changes and Signature..........................  213
Reporter's Certificate.........................  214


              E X H I B I T S

NUMBER        DESCRIPTION                     PAGE

Exhibit 1     Subcontractor Statement of Work  124

Exhibit 2     Email correspondence            127
              Re: 2022 CompuCom Remodel Kick Off
              for Target Remodel Projects

Exhibit 3     Email correspondence            133
              Re: Introductions
Exhibit 4     Email correspondence            138
              Re: Target Stores

Exhibit 5     Email correspondence            147
              Re: FieldLink Team: Tucson Target
Exhibit 6     Email correspondence            153
              Re: Target Added Hours

Exhibit 7     Email correspondence            159
              Re: CompuCom PO - Document Purchase
              Order

Exhibit 8     Staffing Services Agreement     165

Exhibit 9     Addendum Staffing Services Agreement 166
              Pricing Schedule
Exhibit 10    Staffing Services Agreement     168
```

Page 4

```
          E X H I B I T S (cont'd)

NUMBER        DESCRIPTION                     PAGE
Exhibit 11    Email correspondence            169
              Re: Kane Store Status

Exhibit 12    Email correspondence            173
              T2354 Store Needs and Pain Points
              as of 09/15/2022

Exhibit 13    Email correspondence            181
              Re: Kane Store Status
Exhibit 14    Email correspondence            183
              Re: Target Stores Renovation
              Deliverables
Exhibit 15    Email correspondence            190
              Re: Kane Store Status

Exhibit 16    Email correspondence            194
              Re: Target Stores Update
Exhibit 17    Email correspondence            199
              Re: Target Stores - Update Needed

Exhibit 18    Email correspondence            205
              Re: Target Photos W/ Comments
Exhibit 19    Photographs                     207
```

Page 165

1    Q.  Okay.  How do you interpret this line here:

2  $50 an hour, $24,000 total, change order allocation?

3  What does that mean to you?

4    A.  It means there if you divide 24,000 divided by

5  50, there was that many more hours for change order work

6  that was approved by the contractors, all the way up from

7  Kane Comm to CompuCom.

8    Q.  Okay.  So Cable Solutions could bill 24,000

9  more dollars for store T1439?

10    A.  Than the original -- than the original

11  estimated amount, yes.

12    Q.  Okay.  Oh, I forgot to look at these.  I meant

13  to do them earlier.  Let's do this.  I'm going to --

14  what -- what are we on?  8.

15        (Exhibit 8 marked)

16    Q.  I'm going to mark, as Exhibit 8, this document.

17  Let me share my screen.

18        All right.  So what I've marked as

19  Exhibit 8 is titled FieldLink Staffing Services

20  Agreement.  Have you seen this document or a document

21  similar to this before?

22    A.  I'm assuming I have.

23    Q.  Okay.

24    A.  But I don't specifically -- I mean, it probably

25  came through an email and I -- and I -- and I forwarded

Page 166

1  on to our legal and -- on that team.

2    Q.  Okay.  So the first paragraph says it's between

3  FieldLink and Cable Solutions LLC, and it's made December

4  7th, 2021.  You see that?

5    A.  Yes, I see it.

6    Q.  Do you know who Ryan Kasten is?

7    A.  He's the CFO of Kane Holdings.

8    Q.  Okay.  Did you -- so you knew who Mr. Kasten

9  was back in December of 2021?

10    A.  Yes.

11    Q.  Is Mr. Kasten still with Kane?

12    A.  Yes.  He's with Kane Holdings, the parent

13  company.

14    Q.  Is Kane Holdings who employs Mr. Lewis as well?

15    A.  To my knowledge, yes.

16    Q.  All right.  So this contract is signed on

17  December 14th, by Mr. Kasten, of 2021.  Do you know

18  whether or not FieldLink had a relationship with -- with

19  Cable Solutions before this contract?

20    A.  No.  I'm not aware of any relationship before.

21    Q.  Okay.  What I'm going to mark as Exhibit 9 I'm

22  going to drop in the chat.

23        (Exhibit 9 marked)

24    Q.  All right.  Let me share my screen.  Can you

25  see a document titled Addendum Staffing Service

Page 167

1  Agreement?

2    A.  Yes.

3    Q.  Okay.  Let me zoom in.

4        So this says it's an addendum to the

5  staffing services agreement dated December 7th, which I

6  think is what we just looked at, Exhibit 8.  This to me

7  looks like it defines fees if Cable Solutions wants to

8  directly hire a contractor who was placed by FieldLink.

9  Is that right?

10    A.  Not a contractor.  A technician or a personnel.

11  A contractor could be used as a company or as a person in

12  Arizona.  So I just want to make sure I'm clarifying.

13  It's --

14    Q.  Sure.

15    A.  -- an employee of FieldLink, yes.  There is --

16  this agreement is standard with all the -- those staffing

17  agencies for the time worked, and then there's a --

18  there's a payout.

19    Q.  And then so for the shortest amount of time

20  that the -- the technician has been working through

21  FieldLink, if they get hired away directly, you've got to

22  pay a higher percentage because FieldLink didn't get the

23  benefit of billing them out for a longer period of time.

24  Is that right?

25    A.  That's my understanding.

Page 168

1    Q.  All right.  And then the longer that FieldLink

2  has billed out that technician to the client, the -- the

3  amount of the fee that FieldLink receives drops?

4    A.  Yes.  That's my understanding.

5    Q.  Okay.  Can you recall if Cable Solutions hired

6  any -- any technicians directly from FieldLink during --

7    A.  I don't --

8    Q.  I'm sorry?

9    A.  Sorry.  I don't recall.

10    Q.  Okay.  Let me -- I have to finish my questions.

11    A.  I'm sorry.  Apologize.

12    Q.  All right.  Let me mark as Exhibit 10 -- share

13  my screen.

14        (Exhibit 10 marked)

15    Q.  All right.  This is another FieldLink Staffing

16  Services Agreement, but the difference is this one is

17  with Kane Communications.  You see that?

18    A.  Yes, I see it.

19    Q.  This looks like it was also signed by

20  Mr. Kasten right around the end of December of 2021.  Do

21  you know if FieldLink had a relationship with Kane or

22  Kane Communications before this?

23    A.  No, I don't know.

24    Q.  Okay.  Is the reason that there would need to

25  be a separate staffing services agreement -- I guess

Page 169

1  that's because Cable Solutions and Kane Communications
2  are two separate entities?
3  **A.  That is my assumption.**
4        MR. ERLANGER:  Objection.  Form.
5  **A.  I don't know.**
6     Q.  Okay.  All right.  Let's see.  Just getting my
7  next one ready.  All right.  I'm going to mark
8  Exhibit 11.
9        (Exhibit 11 marked)
10    Q.  This is Kane 1765 through 69.  Can you see my
11  screen at the top?  It says -- it's an email from Robert
12  Lewis to Bobby Buchholz and several other people.
13 **A.  Yes.**
14    Q.  All right.  Let's start on the last page.  So
15  this is Kane 1769.  Then I'm going to scroll up till I
16  get to the top of the email.  So at the bottom of the
17  first page of Exhibit 11, there's an email from Jaime
18  Kingston to several people.
19        It says, "Team, I've asked my team to
20  provide what is needed at each of the remaining Kane
21  stores.  Please make sure this gets out to your teams.
22  We must get the deliverables and complete all work that
23  is not delayed by hardware or construction completed
24  before our freeze at the start of November."  And then
25  there's a list of stores and tasks.

Page 170

1        Do you remember receiving this?
2  **A.  I received it.  I don't exactly remember**
3  **receiving it, but yes, I received it.**
4     Q.  Okay.  So you were -- and we -- we can see
5  Mr. Lewis here is -- is forwarding it to team members,
6  including you and Mr. Rhodes and Mr. DeMartz and
7  Mr. Begnoche on September 21st.  You see that?
8  **A.  Uh-huh, yes.**
9     Q.  So do you recall there being a list of
10  outstanding items circulated to Kane and being asked to
11  finish those items?
12 **A.  An outstanding list of what?**
13    Q.  Well, let's see what's on here for your stores.
14 **A.  Like, deliverables?  Or, I mean, I --**
15    Q.  Well, not just deliverables.  Let's see.  So
16  what were in your region?  All right.  So 1386, that was
17  a store in Mesa.
18 **A.  Okay.**
19    Q.  Do you know what "MIST" means?
20 **A.  Not off the top of my head.  It was in the**
21 **book.  It was in their book for some sort of system**
22 **within the site.  I don't know.  I don't know what it**
23 **means.**
24    Q.  Okay.  So there's -- there are some notations
25  on here for not done and no pictures.  No pictures means

Page 171

1  that there's no pictures uploaded of completed tasks?
2  **A.  I guess that would be the assumption, but I**
3  **don't know.**
4     Q.  Okay.  There are some notes where some tasks
5  are waiting on construction, meaning the general
6  contractor?
7  **A.  Could be any trade.**
8     Q.  Okay.  Mobile, need pictures and validation.
9  Firewall not been done.  Router not been done.  Cable
10  test not being done.
11       Do you remember talking with your team --
12       MR. ERLANGER:  Whoa, whoa, whoa, whoa.  It
13  doesn't say cable test has not been done.  It just says
14  cable test.  If you're going to quote the email, quote it
15  accurately.
16    Q.  Every single one says cable test.  If
17  Mr. Erlanger wants to explain to you whether or not
18  that's a list of completed tasks or not completed tasks,
19  I guess y'all can do that during the break.
20       MR. ERLANGER:  I'm -- I'm just asking you
21  to accurately quote the email.  It doesn't say cable
22  test --
23    Q.  What I'm asking you --
24       MR. ERLANGER:  -- has not been done.
25    Q.  -- Mr. Greenawalt --

Page 172

1        MR. ERLANGER:  It just says cable test.
2     Q.  -- because Mr. Erlanger isn't testifying,
3  unless we want to swear him in.  But I'm asking you,
4  Mr. Greenawalt --
5        MR. ERLANGER:  I -- if you want to swear me
6  in to read from an email, you can do that.  But if you're
7  going to --
8        MR. HATCHITT:  Sir --
9        MR. ERLANGER:  -- read from the email, you
10  need to --
11       MR. HATCHITT:  -- please calm down.
12       MR. ERLANGER:  -- read it accurately.
13       MR. HATCHITT:  And please follow the rules.
14    Q.  What I'm asking you, Mr. Greenawalt, is whether
15  you recall having the discussion with your team in
16  September of '22 about the outstanding items that
17  CompuCom reported as not being complete at the stores in
18  Arizona.  Do you recall doing that?
19 **A.  Do I recall specifically?  The time and date,**
20 **no.  But I'm assuming that I would have followed up with**
21 **the team from Arizona to get an understanding of what**
22 **this list -- this list actually represents.**
23    Q.  Okay.  And that was -- that would have been
24  Mr. Rhodes?  He would have been part of your team?
25 **A.  Yes.  He'd have been -- yes, he would have been**



**FieldLink**

Certified WBENC

**STAFFING SERVICES AGREEMENT**

This Agreement is made on the 7th day of December 2021 (the "Effective Date") by and between Industrial Staffing Services Inc. d/b/a FieldLink, a    New Jersey Corporation, with its headquarters located at 25 Kennedy Blvd, East Brunswick, NJ 08816 and its affiliates (collectively, "the Company"), and "Cable Solutions, LLC (hereinafter referred to as "Client").

WHEREAS, the Company provides various services related to the acquisition and placement of temporary and direct hire employees and the provision of payroll services,

WHEREAS, Client from time to time seeks the assistance of the Company in locating and recruiting and/or payrolling labor talent to supplement Client's workforce, and

WHEREAS, Client desires to engage or otherwise employ the "Contractor(s)," defined below and/or "Direct Placements," defined below, and the Company desires to provide Client the services of such personnel on the terms and conditions herein and the Addendum attached hereto ("Addendum").

NOW, THEREFORE, the parties agree as follows:

**1.      Contractor Placements and Direct Placements.**  The Company shall provide Client with the services of the Contractors, which the parties agree shall include Contract Placements and Payroll Service Placements as defined herein (each a "Contractor"). Contract Placements shall be located and recruited by the Company to work an assignment and shall be placed on the Company's payroll. Payroll Service Placements shall be located and recruited by the Client to work an assignment and shall be placed on the Company's payroll. Contractors shall provide the services to Client consistent with the job description provided by Client. Services provided by Contractors hereunder shall be under the direction, supervision and control of Client, and shall be provided at Client's work site, or as otherwise set forth in the Addendum. Client shall have the opportunity to interview each Contractor and shall select each Contractor based upon Client's sole determination that such Contractor possesses the requisite skills, experience, background and education to satisfy the requirements of Client. The Company makes no representation or warranty as to same.

The Company shall provide Client with Direct Placements. Direct Placements shall be personnel who are located and recruited by the Company to work directly as an employee for the Client, or a Contractor subsequently hired by the Client (each a "Direct Placement"). Client agrees to pay the fee referenced on the Addendum ("Direct Placement Fee") to the Company if it hires or engages the services of a Direct Placement that has been referred to it directly through the efforts of the Company, or should Client or its designee hire a Direct Placement submitted by the Company for any position within one (1) year from the Company's most recent communication to Client relating to such Direct Placement. Client also agrees that it shall be liable for payment of the Direct Placement Fee should it refer the Direct Placement to another company that hires the Direct Placement within one (1) year from the Company's most recent communication to Client relating to such Direct Placement.

Client is responsible for informing the Company of Direct Placement candidates actively engaged in the recruiting process directly with Client, at or before the time of submissions of any such candidate by the Company Likewise, Client will notify Company of any candidate who is in the client's data base, or submitted by third party within 7 days of the submission. The notice will provide sufficient detail to enable the Company to consider whether a Direct Place Fee is owed. Any Direct Placement not actively involved with Client or for whom

timely notice is not given, or who was not being considered for the same position irrespective of third party involvement or presence in the database is subject to the Direct Placement Fee. The parties acknowledge and agree that "not actively involved" includes, but is not limited to, passive names in a database.

All Direct Placement candidate referrals made by the Company are made on a confidential basis and are subject to the confidentiality provisions of Section 11, below, and, in addition to the provisions of Section 15, below, Client shall indemnify and hold the Company harmless from any liability resulting from Client's unauthorized disclosure or misuse of information regarding any candidates or their candidacy.

The Company does not guarantee the performance of any Candidate or Direct Placement or the accuracy of information provided regarding a candidate, and disclaims any responsibility for claim, loss, or liability as a result of a Direct Placement's or Contractor's acts or omissions. Client shall conduct such investigations, as it deems necessary to verify Direct Placement information or to obtain such other information, as it may deem relevant. Failure of Client to conduct such investigation shall not result in any liability of the part of the Company.

**2.      Approvals & Billing.**  Client, on the established schedule, shall review and approve or reject Contractor's weekly time submitted in the agreed upon method of time collection. The total approved hours shall constitute a full and complete acceptance of services provided for the period identified therein.

**3.      Payment.**  As consideration for the services to be provided by the Company and Contractors hereunder, Client shall pay the Company pursuant to the terms set forth in the Addendum. All invoices shall be paid by Client. Invoices are payable to:  Industrial Staffing Services, Inc., 25 Kennedy Blvd, East Brunswick, NJ 08816, or in an agreed upon electronic method. Client acknowledges and agrees that it has no legal or equitable defense for failure to pay invoiced time, including, but not limited to any rights of offset.

Should any invoice not be paid as set forth in the Addendum: (i) the Company shall have the right to suspend the services provided pursuant to this Agreement and the Addendum; (ii) any guarantee set forth in the Addendum will be invalidated; and (iii) Client shall be obligated to pay interest on the overdue amounts from the due date to the date payments are actually paid at the rate of the lower of (a) 1.5% per month or (b) the maximum rate permitted by law and Client shall pay all costs of collection including attorney and collection agency fees and charges.

**4.      The Company's Responsibilities.**  Subject to the terms of the Addendum, the Company, as an employer of the Contractors, shall be responsible, at its own expense, for paying all amounts due to or for the benefit of Contractors; to pay and withhold all benefits, payroll taxes, workers compensation premiums or taxes and unemployment taxes required to be paid and/or withheld in connection with Contractors' services provided hereunder; and to otherwise comply with all laws and regulations imposed on the Company as an employer of the Contractors. Company shall provide general safety training to Contractors.

**5.      Client's Responsibilities.**  Subject to the terms of the Addendum, Client shall have no liability to pay any amounts to Contractors, or otherwise provide Contractors with benefits, except as otherwise provided in Client benefit plans and/or pay or withhold any payroll taxes imposed on amounts earned by Contractors. Client shall be solely responsible for training the Contractors with respect to all policies, practices and other guidelines related to the Client, generally, and to the subject job, specifically and shall supervise the work of the Contractor. Client shall be responsible to provide specific safety

EXHIBIT

Greenawalt 8

4

1

training and a safe work environment for Contractors. Pursuant to Section 20, Client shall give the Company prompt notice should a Contractor: (i) fail to follow or abide by these policies, practices and guidelines; (ii) engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal, state, or local statute or regulation; (iii) engage in any other acts of misconduct; or (iv) have any incidences concerning workers compensation, damage to property, or workplace injuries.  Further, Client shall provide Contractors with all necessary materials and resources to perform the services consistent with the subject job description.  Further, Client shall be solely responsible for mitigating and paying any damages, claims, actions or proceedings related to the Contractors arising from claims that an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation. Client represents and warrants that all time worked by the Contractor shall be accurately recorded and approved by the Client and that no "off the clock hours" will be permitted.

Direct Placements shall be the sole employee of Client.  Client shall be solely responsible to pay any amounts to Direct Placements, or otherwise provide Direct Placements with benefits and/or pay or withhold any payroll taxes imposed on amounts earned by Contractor.  Client shall be solely responsible for training the Contractor with respect to all policies, practices and other guidelines related to the Client, generally, and to the subject job, specifically.

Client shall not use the Company's trademarks, including its logo, (the "Marks") without the prior written permission of the Company.  Should Company grant the Client a license to use the Marks, Client shall use the Marks exactly in the form provided and in conformance with any of the Company's trademark usage policies.  Client shall not form any combination marks with the Marks.  Client shall not take any action inconsistent with the Company's ownership of the Marks, and any goodwill and benefits accruing from use of such Marks shall automatically vest in the Company.

**6.      Mutual Obligations.**  The parties agree to cooperate fully and promptly, and to provide any assistance necessary to the other party in which may relate to the Client, the Company or any Contractor or Direct Placement.  The parties shall timely and promptly provide each other (and their attorneys and/or insurers) with copies of any summonses, notices, subpoenas or other legal documents which involve or relate to the Company or any Contractor.  Client and the Company affirm and agree that they are equal employment opportunity employers and are in full compliance with any and all applicable anti-discrimination laws, rules, and regulations, including Executive Order 11246.  Client and the Company agree not to harass, discriminate against, or retaliate against any employee of the other because of his or her race, national origin, age, sex, religion, disability, marital status, or other category protected by law; nor shall either party cause or request the other party to engage in such discrimination, harassment, or retaliation.  In the event of any complaint of unlawful discrimination, harassment, or retaliation by any Contractor, Client and the Company agree to cooperate in the prompt investigation and resolution of such complaint.

In the event a claim is made by a Contractor for discrimination based on an act of an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation the client shall

permit Company to participate in any investigation of such a claim and provide Company with the results of its investigation.

Further, Client and the Company agree that for purposes of all statutory and regulatory requirements for employee leaves of absence, including the Family and Medical Leave Act and any similar state or local law, Client and the Company shall cooperate in compliance with any such requirements.  Client agrees to use its best efforts to reinstate Contractors who are entitled to return to performing Services following a mandated FMLA leave and to comply with all other applicable laws and regulations.

**7.      Term and Termination.**  The term of this Agreement shall commence on the Effective Date and shall continue in effect unless terminated by the Client. The Company can terminate this Agreement at its convenience and discretion without prior notice.

**8.      Conversion of Contractor.**  Except under the terms identified in the Addendum, Client agrees that it will not hire or otherwise engage the services of a Contractor, directly or through an intermediary, for a period of six months from the last day of services provided by that Contractor under this Agreement, without prior written authorization of the Company.

**9.      At-Will Services.**  Contractors may be terminated with or without cause at any time solely by the Company.  In the event of a termination of services of any Contractor, Client is responsible for payment for all hours worked up to the point of termination. Should such termination occur or should any Contractor opt to not provide their services contemplated hereunder, the Company shall have the exclusive right but not the obligation, for thirty (30) days, to supply a new Contractor to provide the services to Client consistent with the job description set forth in the Addendum.

**10.     Relationship of Parties.**  Neither this Agreement nor the services to be provided hereunder shall be construed to create any relationship of employment, agency, partnership or joint venture between the Company and Client or between Contractors and Client.  Further, nothing in this Agreement shall prevent the Company from providing contract staffing services to third-parties.

**11.     Confidentiality.**  The parties agree that all information and data of the other party to which each party has access under this Agreement will be treated as confidential information.  For the purpose of this Agreement, "Confidential Information" shall include any information, and data of a confidential nature, including but not limited to proprietary, developmental, technical, marketing, sales, operating, performance, cost, know-how, business and process information, computer programming techniques, Direct Placement candidate information, Contractor information, and all record bearing media containing or disclosing such information and techniques which is disclosed pursuant to this Agreement.  All such information shall be held in strict confidence by each party, using the same standard of care used by the receiving party to protect its own confidential information, but in no event less than a reasonable standard of care, and shall not be used or disclosed for any purpose except as necessary to implement or perform this Agreement or to defend, institute, or prosecute an arbitration or litigation.

Information shall not be considered confidential if (i) the receiving party is already in possession of the information prior to the Effective Date; (ii) the information becomes part of the public domain through no fault of the receiving party; (iii) the receiving party obtains the information from a third party without violating this provision; or (iv) the information is released in writing by the disclosing party so that the receiving party may make public disclosure.

Upon cancellation or termination of this Agreement, the receiving party agrees to return to the disclosing party any Confidential Information in its possession upon the written request of the disclosing party. The parties' obligations regarding confidential information shall continue in perpetuity.

**12.      Injunctive Relief.** Client acknowledges and agrees that the provisions of Sections 8 and 11 are reasonable and necessary to protect the Company, that any breach of the provisions of these Sections may result in irreparable harm to the Company, and that the remedy at law for such breach may be inadequate. Accordingly, in the event of any breach or threatened breach of the provisions of these Sections by Client, the Company, in addition to any other relief available to it at law, in equity or otherwise, shall be entitled to seek temporary and permanent injunctive relief restraining Client from engaging in and/or continuing any conduct that would constitute a breach of these Sections without the necessity of posting a bond or other security.

**13.      Disclaimer and Limitation of Liability.** THE COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT ARE IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED. THE COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, THE COMPANY WILL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS OR INCOME, OR LOSS OF USE OR OTHER BENEFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PERFORMED UNDER THIS AGREEMENT.

The Company's liability hereunder for all other actual loss or damage under a given Addendum is limited to the amount paid by Client to the Company under the given Addendum, less any claim previously paid.

In all cases, any claim must be brought within twelve (12) months after the occurrence of the alleged act or omission otherwise such claim will be barred.

**14.      Delays Beyond the Parties Control (Force Majeure).** Any delay or non-performance of any provision of this Agreement caused by conditions beyond the reasonable control of the performing party shall not constitute a breach of this Agreement. The delayed party's time for performance shall be deemed to be extended for a period equal to the duration of the conditions beyond its control. Conditions beyond a party's reasonable control include, but are not limited to natural disasters, acts of government after the date of this Agreement, power failure, fire, flood, acts of God, labor disputes, riots, acts of war and pandemics and epidemics.

**15.      Indemnification.** Client shall indemnify and hold harmless the Company and its officers, directors, employees and agents from and against any and all losses, claims, damages, liabilities, obligations, penalties, judgments, awards, costs, expenses and disbursements, including without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any action, suit, proceeding or investigation whether or not asserted by a third party, caused by, relating to, based upon, arising out of or in connection with, (a) any breach by Client of this Agreement including but not limited to failure to timely pay invoices, properly supervise or train Contractors, or provide a safe work environment, (b) negligence, recklessness or intentional misconduct on the part of Client or its affiliates or its officers, directors, employees, agents or consultants, or (c) any claims, actions or proceedings by Contractor arising from claims that an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in

conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation.

The Company shall indemnify and hold harmless Client and its officers, directors, employees and agents from and against any and all losses, claims, damages, liabilities, obligations, penalties, judgments, awards, costs, expenses and disbursements, including without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any action, suit, proceeding or investigation asserted by a third party, caused by, relating to, based upon, arising out of or in connection with, (a) any breach by the Company of this Agreement, or (b) gross negligence, recklessness or intentional misconduct on the part of the Company or its affiliates or its officers, directors, employees, agents or consultants.

**16.      Attorney's Fees.** The Company shall have the right to collect from Client and Client shall have the obligation to pay Company's reasonable costs and necessary disbursements and attorneys' fees incurred in enforcing this Agreement.

**17.      Venue and Choice of Law.** The parties mutually consent to a venue exclusively in the state and federal courts of New Jersey. This Agreement shall be construed under and in accordance with the laws of the State of New Jersey, without regard to its conflict of laws principles.

**18.      Enforceability.** If any provision of this Agreement is held by a tribunal of competent jurisdiction to be illegal, invalid, or otherwise unenforceable in any jurisdiction, then to the fullest extent permitted by law (a) the same shall not affect the other terms or provisions of this Agreement, (b) such term or provision shall be deemed modified to the extent necessary in the tribunal's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest extent the intent and agreements of the parties set forth herein and (c) such finding of invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such term or provision in any other jurisdiction.

**19.      Waiver.** Failure to enforce any term of this Agreement is not a waiver of future enforcement of that or any other term. No term or provision of this Agreement will be deemed waived and no breach excused unless such waiver or excuse is in writing and signed by the party against whom enforcement of such waiver or excuse is sought.

**20.      Notices.** In the event either party must provide notice to the other, the following addresses and/ or numbers shall be used, and shall be sent certified mail, return receipt requested, or by facsimile, with proof of receipt, by either party to the other.

If to the Company:          25 Kennedy Blvd
                            East Brunswick, NJ 08816


                            Fax No: 732-238-2152
                            ATTN: Bradley Block


If to Client:               2461 N Arizona Ave,
                            Chandler, AZ 852251_____
                            Fax No: _____
                            ATTN: _____

All notices sent pursuant to this section shall be deemed effective upon receipt of the same.

**21.    Surviving Sections.** Client shall remain obligated under all the provisions of Sections 2, 3, 5, 8, 11, 12, 13, 15, 16, 17, 18, 19 and 20 of this Agreement which by their nature obligate Client for a time period beyond termination of this Agreement.

**22.    Assignment.** This Agreement may not be assigned without the prior written consent of the other party; provided, however, the Company may assign its rights and obligations under this Agreement to an affiliate without the prior consent of Client.

**23.    Entire Agreement.** This Agreement, and accompanying Addendums, sets forth the entire agreement of the parties and supersedes all other oral or written agreements between the parties, and may only be amended by written agreement.    The above notwithstanding, Client acknowledges and agrees that the Company shall have the right to unilaterally amend the terms of this Agreement without either notice to Client or Client's approval should there be a substantial change, as determined in the Company's sole discretion, to State and Federal laws effecting the Company's ability to reasonably provide the services contemplated by this Agreement and Addendum(s).

**24.    Execution in Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, bear the signatures of both parties hereto. For the purposes hereof, a facsimile copy of this Agreement, including the signature pages hereto, shall be deemed an original.

**25.    Authority.** Each party represents and warrants that each has actual authority and power to enter this Agreement and to be bound by the terms and conditions hereof.    Any individual signing this Agreement on behalf of Client represents, warrants, and guarantees that he or she has full authority to do so.

IN WITNESS WHEREOF, the Agreement has been executed as of the date and year set forth above.

**FieldLink**
**Bradley Block**
Chief Operating Officer

_Bradley Block_
Signature

Cable Solutions, LLC
Client Name

_Ryan R. Kasten_
Printed Name

CEO
Title

_Ryan R. K._
Signature and Date
12/14/2021

FieldLink

Certified WBENC Women's Business Enterprise

EXHIBIT
Greenawalt 9
exhibitsticker.com

ADDENDUM
STAFFING SERVICES AGREEMENT
PRICING SCHEDULE

This Addendum, dated this 7th day of December, is made pursuant to the Staffing Services Agreement (the "Agreement") between Industrial Staffing Services Inc., d/b/a FieldLink, and Cable Solutions, LLC.

Except as otherwise defined below, initially capitalized terms used in this Addendum shall have the same meanings ascribed to them under the Agreement. In the event of conflict between this Addendum and the Agreement, the terms and conditions of this Addendum shall prevail with respect to the subject matter herein. In all other respects, the Agreement shall control.

**FEES AND EXPENSES**: The Client can hire personnel from the Company as follows:

Client can request Contractors, available at an hourly bill rate. Client can provide bill rates / budget to Company. Bill rates will vary based location, duration, and skill level.

The overtime billing rate for all non-exempt Contractors will be at a multiplier to the straight time bill rate as defined by State Department of Labor guidelines. In the case that there are statutory changes that impacts billing, we respectfully request to revisit pricing as it arises. In that event, an addendum will be updated with mutually agreed upon changes.

Upon acceptance of a contingent offer of employment, Company will conduct a seven (7) year criminal misdemeanor and felony background screen, and a five (5) panel urinary drug screen in accordance with local, state and federal legislation.

Company will be responsible for tracking and validating legislatively mandated payouts (sick pay, paid leave, etc.) in jurisdictions where applicable.

Should Client want to convert a Contractor to a Direct Placement within the first 1040 hours of work, a fee will apply solely based upon the hours worked by the employee at the Client site as follows:

- From 0 - 380 hours worked 14% of candidate's first year salary
- From 381- 760 hours worked 12% of candidate's first year salary
- From761 – 1039 hours worked 8% of candidate's first year salary
- After 1040 hours worked No fee will apply

Client can also hire personnel as a Direct Placement. Client agrees to pay a placement fee to the Company in the amount of 15% of the subject Direct Placement's estimated total first year's salary that is hired, directly or indirectly, for any position, as an employee, consultant, or independent contractor, for Client, its affiliates, parents, or subsidiaries.

The Company offers a guarantee period of 90 calendar days from the start date for a Direct Placement, the Company agrees to replace the candidate at no additional fee, or provide a full refund of the fee charged for the direct placement.

If a Direct Placement terminates or is terminated for a company downsizing, lack of work, or business reorganization the fee is still due in its entirety. If the termination is for cause, the guarantee stated above shall be in effect.

**PAYMENT TERMS**: Client agrees to pay all invoices net due within 30 days from the receipt of the invoice.

**Cable Solutions**
2461 N Arizona Ave
Chandler, AZ 85225

Ryan R. Kasten
Print Name and Title

[signature] 12/14/2021
Signature and Date

**FieldLink**
25 Kennedy Blvd, Suite 200
East Brunswick, NJ 08816

Bradley Block COO
Print Name and Title

Bradley Block 12/14/2021
Signature and Date

**STAFFING SERVICES AGREEMENT**

This Agreement is made on the 7th day of December 2021 (the "Effective Date") by and between Industrial Staffing Services Inc. d/b/a FieldLink, a   New Jersey Corporation, with its headquarters located at 25 Kennedy Blvd, East Brunswick, NJ 08816 and its affiliates (collectively, "the Company"), and "Kane Communications" (hereinafter referred to as "Client").

WHEREAS, the Company provides various services related to the acquisition and placement of temporary and direct hire employees and the provision of payroll services,

WHEREAS, Client from time to time seeks the assistance of the Company in locating and recruiting and/or payrolling labor talent to supplement Client's workforce, and

WHEREAS, Client desires to engage or otherwise employ the "Contractor(s)," defined below and/or "Direct Placements," defined below, and the Company desires to provide Client the services of such personnel on the terms and conditions herein and the Addendum attached hereto ("Addendum").

NOW, THEREFORE, the parties agree as follows:

**1.        Contractor Placements and Direct Placements**.    The Company shall provide Client with the services of the Contractors, which the parties agree shall include Contract Placements and Payroll Service Placements as defined herein (each a "Contractor"). Contract Placements shall be located and recruited by the Company to work an assignment and shall be placed on the Company's payroll. Payroll Service Placements shall be located and recruited by the Client to work an assignment and shall be placed on the Company's payroll. Contractors shall provide the services to Client consistent with the job description provided by Client.   Services provided by Contractors hereunder shall be under the direction, supervision and control of Client, and shall be provided at Client's work site, or as otherwise set forth in the Addendum. Client shall have the opportunity to interview each Contractor and shall select each Contractor based upon Client's sole determination that such Contractor possesses the requisite skills, experience, background and education to satisfy the requirements of Client. The Company makes no representation or warranty as to same.

The Company shall provide Client with Direct Placements. Direct Placements shall be personnel who are located and recruited by the Company to work directly as an employee for the Client, or a Contractor subsequently hired by the Client (each a "Direct Placement"). Client agrees to pay the fee referenced on the Addendum ("Direct Placement Fee") to the Company if it hires or engages the services of a Direct Placement that has been referred to it directly through the efforts of the Company, or should Client or its designee hire a Direct Placement submitted by the Company for any position within one (1) year from the Company's most recent communication to Client relating to such Direct Placement. Client also agrees that it shall be liable for payment of the Direct Placement Fee should it refer the Direct Placement to another company that hires the Direct Placement within one (1) year from the Company's most recent communication to Client relating to such Direct Placement.

Client is responsible for informing the Company of Direct Placement candidates actively engaged in the recruiting process directly with Client, at or before the time of submissions of any such candidate by the Company Likewise, Client will notify Company of any candidate who is in the client's data base, or submitted by third party within 7 days of the submission. The notice will provide sufficient detail to enable the Company to consider whether a Direct Place Fee is owed. Any Direct Placement not actively involved with Client or for whom

timely notice is not given, or who was not being considered for the same position irrespective of third party involvement or presence in the database is subject to the Direct Placement Fee. The parties acknowledge and agree that "not actively involved" includes, but is not limited to, passive names in a database.

All Direct Placement candidate referrals made by the Company are made on a confidential basis and are subject to the confidentiality provisions of Section 11, below, and, in addition to the provisions of Section 15, below, Client shall indemnify and hold the Company harmless from any liability resulting from Client's unauthorized disclosure or misuse of information regarding any candidates or their candidacy.

The Company does not guarantee the performance of any Candidate or Direct Placement or the accuracy of information provided regarding a candidate, and disclaims any responsibility for claim, loss, or liability as a result of a Direct Placement's or Contractor's acts or omissions. Client shall conduct such investigations, as it deems necessary to verify Direct Placement information or to obtain such other information, as it may deem relevant. Failure of Client to conduct such investigation shall not result in any liability of the part of the Company.

**2.        Approvals & Billing.**  Client, on the established schedule, shall review and approve or reject Contractor's weekly time submitted in the agreed upon method of time collection. The total approved hours shall constitute a full and complete acceptance of services provided for the period identified therein.

**3.        Payment.**  As consideration for the services to be provided by the Company and Contractors hereunder, Client shall pay the Company pursuant to the terms set forth in the Addendum.  All invoices shall be paid by Client. Invoices are payable to:  Industrial Staffing Services, Inc., 25 Kennedy Blvd, East Brunswick, NJ 08816, or in an agreed upon electronic method.  Client acknowledges and agrees that it has no legal or equitable defense for failure to pay invoiced time, including, but not limited to any rights of offset.

Should any invoice not be paid as set forth in the Addendum: (i) the Company shall have the right to suspend the services provided pursuant to this Agreement and the Addendum; (ii) any guarantee set forth in the Addendum will be invalidated; and (iii) Client shall be obligated to pay interest on the overdue amounts from the due date to the date payments are actually paid at the rate of the lower of (a) 1.5% per month or (b) the maximum rate permitted by law and Client shall pay all costs of collection including attorney and collection agency fees and charges.

**4.        The Company's Responsibilities.**  Subject to the terms of the Addendum, the Company, as an employer of the Contractors, shall be responsible, at its own expense, for paying all amounts due to or for the benefit of Contractors; to pay and withhold all benefits, payroll taxes, workers compensation premiums or taxes and unemployment taxes required to be paid and/or withheld in connection with Contractors' services provided hereunder; and to otherwise comply with all laws and regulations imposed on the Company as an employer of the Contractors. Company shall provide general safety training to Contractors.

**5.        Client's Responsibilities.**  Subject to the terms of the Addendum, Client shall have no liability to pay any amounts to Contractors, or otherwise provide Contractors with benefits, except as otherwise provided in Client benefit plans and/or pay or withhold any payroll taxes imposed on amounts earned by Contractors. Client shall be solely responsible for training the Contractors with respect to all policies, practices and other guidelines related to the Client, generally, and to the subject job, specifically and shall supervise the work of the Contractor.   Client shall be responsible to provide specific safety

EXHIBIT

Greenawalt 10    9

1



training and a safe work environment for Contractors. Pursuant to Section 20, Client shall give the Company prompt notice should a Contractor: (i) fail to follow or abide by these policies, practices and guidelines; (ii) engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal, state, or local statute or regulation; (iii) engage in any other acts of misconduct; or (iv) have any incidences concerning workers compensation, damage to property, or workplace injuries. Further, Client shall provide Contractors with all necessary materials and resources to perform the services consistent with the subject job description. Further, Client shall be solely responsible for mitigating and paying any damages, claims, actions or proceedings related to the Contractors arising from claims that an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation. Client represents and warrants that all time worked by the Contractor shall be accurately recorded and approved by the Client and that no "off the clock hours" will be permitted.

Direct Placements shall be the sole employee of Client. Client shall be solely responsible to pay any amounts to Direct Placements, or otherwise provide Direct Placements with benefits and/or pay or withhold any payroll taxes imposed on amounts earned by Contractor. Client shall be solely responsible for training the Contractor with respect to all policies, practices and other guidelines related to the Client, generally, and to the subject job, specifically.

Client shall not use the Company's trademarks, including its logo, (the "Marks") without the prior written permission of the Company. Should Company grant the Client a license to use the Marks, Client shall use the Marks exactly in the form provided and in conformance with any of the Company's trademark usage policies. Client shall not form any combination marks with the Marks. Client shall not take any action inconsistent with the Company's ownership of the Marks, and any goodwill and benefits accruing from use of such Marks shall automatically vest in the Company.

**6.    Mutual Obligations.** The parties agree to cooperate fully and promptly, and to provide any assistance necessary to the other party in which may relate to the Client, the Company or any Contractor or Direct Placement. The parties shall timely and promptly provide each other (and their attorneys and/or insurers) with copies of any summonses, notices, subpoenas or other legal documents which involve or relate to the Company or any Contractor. Client and the Company affirm and agree that they are equal employment opportunity employers and are in full compliance with any and all applicable anti-discrimination laws, rules, and regulations, including Executive Order 11246. Client and the Company agree not to harass, discriminate against, or retaliate against any employee of the other because of his or her race, national origin, age, sex, religion, disability, marital status, or other category protected by law; nor shall either party cause or request the other party to engage in such discrimination, harassment, or retaliation. In the event of any complaint of unlawful discrimination, harassment, or retaliation by any Contractor, Client and the Company agree to cooperate in the prompt investigation and resolution of such complaint.

In the event a claim is made by a Contractor for discrimination based on an act of an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation the client shall permit Company to participate in any investigation of such a claim and provide Company with the results of its investigation.

Further, Client and the Company agree that for purposes of all statutory and regulatory requirements for employee leaves of absence, including the Family and Medical Leave Act and any similar state or local law, Client and the Company shall cooperate in compliance with any such requirements. Client agrees to use its best efforts to reinstate Contractors who are entitled to return to performing Services following a mandated FMLA leave and to comply with all other applicable laws and regulations.

**7.    Term and Termination.** The term of this Agreement shall commence on the Effective Date and shall continue in effect unless terminated by the Client. The Company can terminate this Agreement at its convenience and discretion without prior notice.

**8.    Conversion of Contractor.** Except under the terms identified in the Addendum, Client agrees that it will not hire or otherwise engage the services of a Contractor, directly or through an intermediary, for a period of six months from the last day of services provided by that Contractor under this Agreement, without prior written authorization of the Company.

**9.    At-Will Services.** Contractors may be terminated with or without cause at any time solely by the Company. In the event of a termination of services of any Contractor, Client is responsible for payment for all hours worked up to the point of termination. Should such termination occur or should any Contractor opt to not provide their services contemplated hereunder, the Company shall have the exclusive right but not the obligation, for thirty (30) days, to supply a new Contractor to provide the services to Client consistent with the job description set forth in the Addendum.

**10.    Relationship of Parties.** Neither this Agreement nor the services to be provided hereunder shall be construed to create any relationship of employment, agency, partnership or joint venture between the Company and Client or between Contractors and Client. Further, nothing in this Agreement shall prevent the Company from providing contract staffing services to third-parties.

**11.    Confidentiality.** The parties agree that all information and data of the other party to which each party has access under this Agreement will be treated as confidential information. For the purpose of this Agreement, "Confidential Information" shall include any information, and data of a confidential nature, including but not limited to proprietary, developmental, technical, marketing, sales, operating, performance, cost, know-how, business and process information, computer programming techniques, Direct Placement candidate information, Contractor information, and all record bearing media containing or disclosing such information and techniques which is disclosed pursuant to this Agreement. All such information shall be held in strict confidence by each party, using the same standard of care used by the receiving party to protect its own confidential information, but in no event less than a reasonable standard of care, and shall not be used or disclosed for any purpose except as necessary to implement or perform this Agreement or to defend, institute, or prosecute an arbitration or litigation.

Information shall not be considered confidential if (i) the receiving party is already in possession of the information prior to the Effective Date; (ii) the information becomes part of the public domain through no fault of the receiving party; (iii) the receiving party obtains the information from a third party without violating this provision; or (iv) the information is released in writing by the disclosing party so that the receiving party may make public disclosure.

Upon cancellation or termination of this Agreement, the receiving party agrees to return to the disclosing party any Confidential Information in its possession upon the written request of the disclosing party. The parties' obligations regarding confidential information shall continue in perpetuity.

**12.    Injunctive Relief.**  Client acknowledges and agrees that the provisions of Sections 8 and 11 are reasonable and necessary to protect the Company, that any breach of the provisions of these Sections may result in irreparable harm to the Company, and that the remedy at law for such breach may be inadequate. Accordingly, in the event of any breach or threatened breach of the provisions of these Sections by Client, the Company, in addition to any other relief available to it at law, in equity or otherwise, shall be entitled to seek temporary and permanent injunctive relief restraining Client from engaging in and/or continuing any conduct that would constitute a breach of these Sections without the necessity of posting a bond or other security.

**13.    Disclaimer and Limitation of Liability.**  THE COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT ARE IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED. THE COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.   REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, THE COMPANY WILL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS OR INCOME, OR LOSS OF USE OR OTHER BENEFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PERFORMED UNDER THIS AGREEMENT.

The Company's liability hereunder for all other actual loss or damage under a given Addendum is limited to the amount paid by Client to the Company under the given Addendum, less any claim previously paid.

In all cases, any claim must be brought within twelve (12) months after the occurrence of the alleged act or omission otherwise such claim will be barred.

**14.    Delays Beyond the Parties Control (Force Majeure).**  Any delay or non-performance of any provision of this Agreement caused by conditions beyond the reasonable control of the performing party shall not constitute a breach of this Agreement. The delayed party's time for performance shall be deemed to be extended for a period equal to the duration of the conditions beyond its control. Conditions beyond a party's reasonable control include, but are not limited to natural disasters, acts of government after the date of this Agreement, power failure, fire, flood, acts of God, labor disputes, riots, acts of war and pandemics and epidemics.

**15.    Indemnification.**  Client shall indemnify and hold harmless the Company and its officers, directors, employees and agents from and against any and all losses, claims, damages, liabilities, obligations, penalties, judgments, awards, costs, expenses and disbursements, including without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any action, suit, proceeding or investigation whether or not asserted by a third party, caused by, relating to, based upon, arising out of or in connection with, (a) any breach by Client of this Agreement including but not limited to failure to timely pay invoices, properly supervise or train Contractors, or provide a safe work environment, (b) negligence, recklessness or intentional misconduct on the part of Client or its affiliates or its officers, directors, employees, agents or consultants, or (c) any claims, actions or proceedings by Contractor arising from claims that an agent, officer, supervisor or employee of Client, other than employees, agents or officers of the Company, engaged in

conduct in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or any other Federal or state statute or regulation.

The Company shall indemnify and hold harmless Client and its officers, directors, employees and agents from and against any and all losses, claims, damages, liabilities, obligations, penalties, judgments, awards, costs, expenses and disbursements, including without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any action, suit, proceeding or investigation asserted by a third party, caused by, relating to, based upon, arising out of or in connection with, (a) any breach by the Company of this Agreement, or (b) gross negligence, recklessness or intentional misconduct on the part of the Company or its affiliates or its officers, directors, employees, agents or consultants.

**16.    Attorney's Fees.**  The Company shall have the right to collect from Client and Client shall have the obligation to pay Company's reasonable costs and necessary disbursements and attorneys' fees incurred in enforcing this Agreement.

**17.    Venue and Choice of Law.**  The parties mutually consent to a venue exclusively in the state and federal courts of New Jersey. This Agreement shall be construed under and in accordance with the laws of the State of New Jersey, without regard to its conflict of laws principles.

**18.    Enforceability.**  If any provision of this Agreement is held by a tribunal of competent jurisdiction to be illegal, invalid, or otherwise unenforceable in any jurisdiction, then to the fullest extent permitted by law (a) the same shall not affect the other terms or provisions of this Agreement, (b) such term or provision shall be deemed modified to the extent necessary in the tribunal's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest extent the intent and agreements of the parties set forth herein and (c) such finding of invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of such term or provision in any other jurisdiction.

**19.    Waiver.**  Failure to enforce any term of this Agreement is not a waiver of future enforcement of that or any other term. No term or provision of this Agreement will be deemed waived and no breach excused unless such waiver or excuse is in writing and signed by the party against whom enforcement of such waiver or excuse is sought.

**20.    Notices.**  In the event either party must provide notice to the other, the following addresses and/ or numbers shall be used, and shall be sent certified mail, return receipt requested, or by facsimile, with proof of receipt, by either party to the other.

If to the Company:        25 Kennedy Blvd
                          East Brunswick, NJ 08816

                          Fax No: 732-238-2152
                          ATTN: Bradley Block

If to Client:             572 Whitehead Rd # 201,
                          Trenton, NJ 08619_____
                          Fax No:_____
                          ATTN: Legal / CFO

All notices sent pursuant to this section shall be deemed effective upon receipt of the same.



**21.    Surviving Sections.** Client shall remain obligated under all the provisions of Sections 2, 3, 5, 8, 11, 12, 13, 15, 16, 17, 18, 19 and 20 of this Agreement which by their nature obligate Client for a time period beyond termination of this Agreement.

**22.    Assignment.** This Agreement may not be assigned without the prior written consent of the other party; provided, however, the Company may assign its rights and obligations under this Agreement to an affiliate without the prior consent of Client.

**23.    Entire Agreement.** This Agreement, and accompanying Addendums, sets forth the entire agreement of the parties and supersedes all other oral or written agreements between the parties, and may only be amended by written agreement.    The above notwithstanding, Client acknowledges and agrees that the Company shall have the right to unilaterally amend the terms of this Agreement without either notice to Client or Client's approval should there be a substantial change, as determined in the Company's sole discretion, to State and Federal laws effecting the Company's ability to reasonably provide the services contemplated by this Agreement and Addendum(s).

**24.    Execution in Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, bear the signatures of both parties hereto. For the purposes hereof, a facsimile

copy of this Agreement, including the signature pages hereto, shall be deemed an original.

**25.    Authority.** Each party represents and warrants that each has actual authority and power to enter this Agreement and to be bound by the terms and conditions hereof.    Any individual signing this Agreement on behalf of Client represents, warrants, and guarantees that he or she has full authority to do so.

IN WITNESS WHEREOF, the Agreement has been executed as of the date and year set forth above.

**FieldLink**
***Bradley Block***
Chief Operating Officer

*Bradley Block*
Signature

Kane Communications
Client Name

RYAN R. Knston
Printed Name

CFO
Title

_Ryan R Kr._
Signature and Date

12/20/2021

**ADDENDUM**
**STAFFING SERVICES AGREEMENT**
**PRICING SCHEDULE**

This Addendum, dated this 17th day of December, is made pursuant to the Staffing Services Agreement (the "Agreement") between Industrial Staffing Services Inc., d/b/a FieldLink, and Kane Communications.

Except as otherwise defined below, initially capitalized terms used in this Addendum shall have the same meanings ascribed to them under the Agreement. In the event of conflict between this Addendum and the Agreement, the terms and conditions of this Addendum shall prevail with respect to the subject matter herein. In all other respects, the Agreement shall control.

**FEES AND EXPENSES**:  The Client can hire personnel from the Company as follows:

Client can request Contractors, available at an hourly bill rate. Client can provide bill rates / budget to Company.  Bill rates will vary based location, duration, and skill level.

The overtime billing rate for all non-exempt Contractors will be at a multiplier to the straight time bill rate as defined by State Department of Labor guidelines. In the case that there are statutory changes that impacts billing, we respectfully request to revisit pricing as it arises. In that event, an addendum will be updated with mutually agreed upon changes.

Upon acceptance of a contingent offer of employment, Company will conduct a seven (7) year criminal misdemeanor and felony background screen, and a five (5) panel urinary drug screen in accordance with local, state and federal legislation.

Company will be responsible for tracking and validating legislatively mandated payouts (sick pay, paid leave, etc.) in jurisdictions where applicable.

Should Client want to convert a Contractor to a Direct Placement within the first 1040 hours of work, a fee will apply solely based upon the hours worked by the employee at the Client site as follows:

- From 0 - 380 hours worked 14% of candidate's first year salary
- From 381- 760 hours worked 12% of candidate's first year salary
- From 761 – 1039 hours worked 8% of candidate's first year salary
- After 1040 hours worked  No fee will apply

Client can also hire personnel as a Direct Placement.  Client agrees to pay a placement fee to the Company in the amount of 15% of the subject Direct Placement's estimated total first year's salary that is hired, directly or indirectly, for any position, as an employee, consultant, or independent contractor, for Client, its affiliates, parents, or subsidiaries.

The Company offers a guarantee period of 90 calendar days from the start date for a Direct Placement, the Company agrees to replace the candidate at no additional fee or provide a full refund of the fee charged for the direct placement.

If a Direct Placement terminates or is terminated for a company downsizing, lack of work, or business reorganization the fee is still due in its entirety.  If the termination is for cause, the guarantee stated above shall be in effect.

**PAYMENT TERMS**: Client agrees to pay all invoices net due within 30 days from the receipt of the invoice.

| | |
|---|---|
| **Kane Communications** | **FieldLink** |
| 572 Whitehead Rd # 201 | 25 Kennedy Blvd, Suite 200 |
| Trenton, NJ 08619 | East Brunswick, NJ 08816 |

_Ryan R. Karten_

Print Name and Title

_Ryan R. K._  12/20/2021

Signature and Date

Bradley Block, COO

Print Name and Title

_Bradley Block_  12/21/2021

Signature and Date

**To:**      Steve Radmann[sradmann@kanecomm.com]; Matt Russo[MRusso@fieldlink.net]; Mike Schiano[mschiano@fieldlink.net]
**Cc:**      Robert Buchholz[RBuchholz@kanecomm.com]
**From:**    Angelo Romeo
**Sent:**    2022-09-07T11:24:39-04:00
**Importance:**    Normal
**Subject:**  RE: T2011 Target Arden -Dilen Smartsheet Daily Tech Workbook
**Received:**    2022-09-07T11:24:42-04:00



EXHIBIT

____11____

Penalties start from Last week enough is enough
Regards,

### Angelo N. Romeo

**Vice President of New York Operations**

*Kane Communications*



**O.** 609.586.8800 **M.** 646-296-1550

**W.** www.KANE.com

**E.** aromeo@kanecomm.com

**New York, NY**

**From:** Steve Radmann <sradmann@kanecomm.com>
**Sent:** Wednesday, September 7, 2022 10:43 AM
**To:** Matt Russo <MRusso@fieldlink.net>; Mike Schiano <mschiano@fieldlink.net>
**Cc:** Robert Buchholz <RBuchholz@kanecomm.com>; Steve Radmann <sradmann@kanecomm.com>; Angelo Romeo <aromeo@kanecomm.com>
**Subject:** T2011 Target Arden -Dilen Smartsheet Daily Tech Workbook
**Importance:** High
Good morning,
T2011 Smartsheet Daily Tech Workbook hasn't been updated since 8-16-22.
Guys he needs another Talk ASAP , I can't keep telling him this every single night .
I am getting exhausted babysitting these guys.
PLEASE HELP !
James Barnes as well , had to rip into John last night about Smartsheet's for T2090 as well !
Penalties are being enforced and will be passed down.
Thank you,
SR



**Steven Radmann**

**Estimator**

*Kane Communications*

KANE-PROD_COMP0001615

**O.** 609.586.8800 **M.** 516.779.0222

**W.** www.KANE.com

**E.** sradmann@kanecomm.com

**Charlotte, NC**

KANE-PROD_COMP0001616

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4

5   KANE COMMUNICATIONS LLC,    )

6   Plaintiff/                  )   Civil No.

7   Counter-Defendant,          )   3:23-cv-00824-E

8   vs.                         )

9   COMPUCOM SYSTEMS, INC.,     )

10  Defendant/Counter-          )

11  Plaintiff.                  )

12

13

14
        ORAL REMOTE AND VIDEOTAPED DEPOSITION OF
15                    STEVEN RADMANN
                   October 23, 2024
16

17        ORAL REMOTE AND VIDEOTAPED DEPOSITION OF

18  STEVEN RADMANN, duly sworn, was taken in the above-styled

19  and numbered cause on October 23, 2024, from 9:59 a.m. to

20  5:23 p.m., before KATRINA FAITH WRIGHT, Certified

21  Shorthand Reporter in and for the State of Texas,

22  reported by machine shorthand, taken remotely, pursuant

23  to the Federal Rules of Civil Procedure.

24

25
```

1   and will be passed down.

2              Do you see that?

3       A.    Yes, I do.

4       Q.    What are -- what penalties are you talking

5   about?

6       A.    When they -- I think somebody said 500 a day if

7   you're not done.  So I was just telling Mike we are going

8   to pass those down to you if he doesn't start doing it.

9   That's all that was.

10      Q.    Okay.  So the penalties for not properly

11  recording work completed in a daily tech workbook, your

12  understanding was that there was going to be fines

13  assessed from CompuCom to Kane?

14      A.    Yes.

15      Q.    Okay.

16      A.    I believe, yeah.

17      Q.    And you're saying here in the e-mail to

18  Mr. Russo and Schiano that those fines are being passed

19  down from Kane to Fieldlink?

20      A.    If they were enforced, yes.

21      Q.    Okay.

22      A.    Which they never were.  Nobody ever -- not that

23  I'm aware of.  No fines were ever enforced on either

24  organization or any -- that I'm aware of.

25      Q.    Okay.  The top e-mail in Exhibit -- I think this



1    is 10 or maybe 11 -- is an e-mail from Mr. Romeo to you

2    on September 7th:  Penalties start from last week.

3    Enough is enough.

4              Do you see that?

5        A.    Yes, I do.

6        Q.    So is Mr. Romeo agreeing with you that the --

7    that the penalties for failing to make entries are going

8    to be passed down to Fieldlink?

9        A.    Yeah, I think it was just like a threatening

10   e-mail to say they are going to be passed down, not that

11   they would eventually, but they never did end up

12   happening.

13       Q.    It's an appropriate response to assess a fine

14   like that on Fieldlink for not entering daily tech

15   workbook entries?

16       A.    Is that something -- say that again.  I'm sorry.

17       Q.    Was it appropriate for Kane to assess penalties

18   on Fieldlink for not timely entering daily tech workbook

19   entries?

20              MR. FARRELL:  Objection to the form.

21       A.    I'm not -- I'm not -- I'm not sure how to answer

22   that.

23       Q.    (By Mr. Hatchitt)  Okay.  Do you think it was

24   fair?

25       A.    If we got penalized?



1    Q.   Yes.

2    A.   Sure.

3    Q.   To pass that down to Fieldlink?

4    A.   Sure.

5    Q.   Because Fieldlink's behavior is what was causing

6    Kane to be fined?

7    A.   Yeah, you could say that.

8    Q.   I'm going to show you what I'm marking

9    Exhibit 12.

10            (Exhibit No. 12 marked.)

11   Q.   Exhibit 12 is a two-page document.  It's Kane

12   1706 to 1707.  I'm going to start with the bottom e-mail.

13   This is a request -- or an e-mail from Ron Benco on

14   Friday, September 9th, 2022, and it's sent to you, James

15   Barnes, John Sain, and Steve Radmann.  Do you see that?

16   A.   Yes.

17   Q.   This is for store T2090.  That's the Charlotte

18   store?

19   A.   Yes, 2090.

20   Q.   Were you still the project manager for 2090 at

21   that point?

22   A.   September, October?  Probably.

23   Q.   Okay.

24   A.   I believe I was.

25   Q.   So Ron -- the subject line is:  T2090 video game

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KANE COMMUNICATIONS LLC, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| vs. | § | Civil No. No. 3:23-cv-00824-E |
| | § | |
| COMPUCOM SYSTEMS INC., | § | |
| | § | |
| *Defendant/Counter-Plaintiff*. | § | |

---

## COMPUCOM SYSTEMS INC.'S SECOND AMENDED OBJECTIONS AND RESPONSES TO KANE COMMUNICATIONS LLC'S FIRST SET OF INTERROGATORIES

---

Defendant/Counter-Plaintiff CompuCom Systems, Inc. (CompuCom) serves these second amended objections and responses to Plaintiff/Counter-Defendant Kane Communications, LLC (Kane) first set of interrogatories, pursuant to Rule 33 of the Federal Rules of Civil Procedure.

Dated: April 18, 2025

Respectfully submitted,

WEISBART SPRINGER STORM HATCHITT LLP

James C. Hatchitt
  State Bar No. 24072478
  jhatchitt@weisbartspringer.com
Julie A. Springer
  State Bar No. 18966770
  jspringer@weisbartspringer.com
Colleen Murphey
  State Bar No. 24102258
  cmurphey@weisbartspringer.com
212 Lavaca Street, Suite 200
Austin, Texas 78701
Tel. (512) 652-5780
Fax (512) 682-2074

20

William B. Mateja
  State Bar No. 13185350
  bmateja@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON
LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Tel. (469) 391-7400
Fax (469) 391-7401

*Attorneys for defendant/counter-plaintiff*
*CompuCom Systems, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on April 18, 2025, in accordance with Rule 5(b)(2) of the Federal Rules of Civil Procedure, to the parties listed and in the manner indicated below:

Anderson Sessions
rasessions@cokinoslaw.com
COKINOS YOUNG, PC
One Galleria Tower
13355 Noel Road, Suite 1375
Dallas, Texas 75240
Tel. (817) 635-3600
Fax (817) 635-3633

□ Electronic service
□ In person
□ Registered mail, return receipt requested
□ Commercial delivery service
□ Facsimile
✓ Electronic mail

Shawn R. Farrell
sfarrell@cohenseglias.com
Matthew L. Erlanger
merlanger@cohenseglias.com
COHEN, SEGLIAS, PALLAS, GREENHALL
& FURMAN, PC
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
Tel. (215) 564-1700
Fax (215) 564-3066

*Attorneys for plaintiff/counter-defendant Kane*
*Communications LLC*

James Hatchitt

- 2 -

21

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.      CompuCom objects to Definitions 5–7 (of "Identify") as overbroad, unduly burdensome, and an attempt to exceed the limits imposed by the Federal Rules of Civil Procedure. When CompuCom responds to an interrogatory asking it to "identify" people, documents, or information, it will name the person or document and/or describe the information with reasonable and relevant details for context, as needed.

2.      CompuCom objects to Instruction 12 as inconsistent with Rule 26(b)(5). CompuCom will comply with Rule 26(b)(5).

3.      CompuCom objects to Definition 14 (of "CompuCom," "you," and "your") as vague and ambiguous, because it is not reasonably clear what the phrase "purporting to act on [CompuCom's] behalf" means.

CompuCom further objects to Definition 14 because it attempts to require third parties who are not parties to this cause and have not been served with a subpoena to somehow comply with or respond to discovery requests.  CompuCom objects to any attempt to require it to respond to the discovery requests by producing documents or information that is in the possession of persons or entities that are beyond its control.

4.      CompuCom objects to Instruction 13, to the extent it attempts to contravene the attorney-client privilege, the work-product doctrine, or any other statutory or common-law privilege or protection.

---

## COMPUCOM'S SPECIFIC OBJECTIONS AND RESPONSES
## TO KANE'S FIRST SET OF INTERROGATORIES

---

### INTERROGATORY NO. 1.

State the name, business address, job title or position, and length of service with CompuCom for each person who prepared, participated in the preparation of, provided information in answer to, or executed the answers to these Interrogatories and identify each and every document utilized by each person who participated in the preparation of these answers.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory as vague and ambiguous, because it is not reasonably clear what the phrase "utilized by each person" means. For example, it may refer to a document an individual reviewed immediately before answering one of these interrogatories. Or it could mean a document that contains information on which the individual relied to answer one of these interrogatories, regardless of when the individual last reviewed the document itself.

CompuCom further specifically objects to this interrogatory as overbroad, overly burdensome, and harassing, to the extent it seeks to require CompuCom to identify every single document that contains information on which an individual answering these interrogatories relied to provide answers.

CompuCom further specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

Brenda Hanson
Edina, Minnesota office
[Works from home]
Program Director
31 years

Ron DeLand
Edina, Minnesota office
[Works from home]
Project Manager
24 years

Semi Ferrante
Dallas, Texas Office
[Works from home]
Senior Director, Strategic Sourcing
14 years

Counsel for CompuCom

In addition to the specific objections described above, CompuCom declines to identify every single document that the individuals above "utilized" to prepare answers to these interrogatories. Doing so would require CompuCom to disclose information protected by the attorney-client privilege, namely, the identification of documents selected in combination with counsel to respond to certain interrogatories.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

**INTERROGATORY NO. 2.**
State the name, business/company affiliation, business address and job title or position of all persons who possess knowledge of the facts and circumstances underlying this Action including, but not limited to, the facts and circumstances relating to the termination of Kane from the Projects and/or CompuCom's withholding of payment from Kane as it relates to the Projects. As to each person identified, describe the extent and nature of their knowledge.

**ANSWER:**
Subject to its objections to definitions and instructions, CompuCom responds as follows:

Please see the list of individuals likely to have discoverable information contained in CompuCom's Initial Disclosures, which were served on June 20, 2023.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

**INTERROGATORY NO. 3.**
State and describe Kane's original scope of work under each of the SOWs, and any subsequent changes made thereto.

**ANSWER:**
Subject to its objections to definitions and instructions, CompuCom responds as follows:

CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing

CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the SOWs between CompuCom and Kane for the Target stores in question, and their attached exhibits (including the SOW dated October 14, 2021, and the SOW dated April 1, 2022).

Further, any changes to Kane's original scope of work under each of the SOWs would be reflected in change orders accepted by Target prior to Kane's termination in January 2023.

Kane is already in possession of each of those documents. Further, CompuCom has produced (or will produce shortly) each of those documents in this lawsuit.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.


## INTERROGATORY NO. 4.

State the amount that CompuCom agreed to pay Kane for the services provided under the SOWs.

**ANSWER:**

Subject to its objections to definitions and instructions, CompuCom responds as follows:

CompuCom agreed to pay Kane its agreed hourly rate for each store (as specified in the SOWs) multiplied by the number of approved hours budgeted for completion of the services (as specified in the SOWs). Further, Kane would be paid at its hourly rate for any additional hours approved via change orders. The amount CompuCom agreed to pay Kane varied by location, and was defined in the SOWs.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the SOWs between CompuCom and Kane for the Target stores in question, and their attached exhibits (including the SOW dated October 14, 2021, and the SOW dated April 1, 2022).

Further, the amount CompuCom agreed to pay Kane under each of the SOWs would be reflected in change orders accepted by Target.

Kane is already in possession of each of those documents. Further, CompuCom has produced (or will produce shortly) each of those documents in this lawsuit.

- 6 -

Discovery is ongoing.  CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 5.

State the value of the unfinished portion of Kane's work at the time of termination and identify and provide the documents related to the calculation.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory as vague and ambiguous, because it is unclear what the term "value of the unfinished portion of Kane's work" means.  For example, it is not clear whether "unfinished portion of Kane's work" means (i) work Kane did not attempt; (ii) work Kane represented it completed but did not; (iii) work Kane attempted but did not complete to contractual standards, in a good and workmanlike fashion, and/or according to industry standards of care; or some combination of those.

**ANSWER:**

Based on its specific objection, CompuCom declines to respond to this interrogatory as presently worded.

CompuCom is willing to confer with Kane regarding the information sought by this interrogatory, and will supplement its answer if and when Kane clarifies the information sought.

Discovery is ongoing.  CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 6.

If at any time CompuCom, gave Kane any oral or written notice relating to the reason or justification for the withholding of payment to Kane, provide the following information as to each notice: the date of each notice, whether each notice was oral or written, the individual to whom each notice was provided and all documents related to your answer in this Interrogatory.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

CompuCom directs Kane to the January 10, 2023, letter from Semi Ferrante to Robert Lewis notifying Kane of termination of the contracts between CompuCom and Kane

due to Kane's material breaches of the contracts and anticipatory repudiation of the contracts, and advising Kane that CompuCom was withholding payment to Kane on its outstanding invoices.

Prior to the January 2023 letter, CompuCom provided Kane with notice and an opportunity to cure Kane's defective work on multiple occasions, in person and in writing. Those notices came through oral and written communications between CompuCom's and Kane's project managers at the Target stores.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

### INTERROGATORY NO. 7.

State whether you allege that any statements against interest and/or admissions, as defined by the Federal Rules of Evidence, have been made by any person having knowledge relevant to the subject matter of this Action. If so, provide the following information:

a.    The date made;
b.    The name of the person by whom made;
c.    The name and address of the person to whom made;
d.    Where made;
e.    The name and address of each person present at the time the statement and/or admission was made;
f.    The contents of the statement and/or admission; and
g.    If in writing, attach a copy.

**SPECIFIC OBJECTIONS:**
CompuCom specifically objects to this interrogatory because it is a "blockbuster interrogatory," and does not identify with reasonable particularity the information it seeks. This Court has held "blockbuster interrogatories" are inappropriate under Rule 33, because "a party cannot ordinarily be forced to prepare its opponent's case." *Nieman v. Hale*, No. 3:12-CV-2433-L-BN, 2013 U.S. Dist. LEXIS 180397, at *29–31 (N.D. Tex. Dec. 26, 2013); *see Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 576 (N.D. Tex. 2018) (same).

By way of example, this interrogatory seeks the identification of (i) any statement by (ii) any person (iii) whom CompuCom believes has knowledge relevant to the subject matter of this lawsuit (iv) that CompuCom believes was against that individual's interest or constituted an admission. Such a request seeks to "force [CompuCom] to "prepare [Kane's] case."

**ANSWER:**
Based on its specific objections, CompuCom declines to respond to this interrogatory as presently worded.

- 8 -

27

To the extent Kane attempts to narrow and identify with particularity the information it seeks, CompuCom will confer and work with Kane on responding to an amended interrogatory.

Discovery is ongoing.  CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 8.

If you contend that Kane is not entitled to the outstanding amounts identified below for work performed at each of the respective stores, please explain with specificity and particularity your reason(s) for each, as follows:

| | |
|---|---|
| Target T1807 Asheville NC | $5,408.00 |
| Target T0961 Cary NC | $10,296.00 |
| Target T1439 Tucson EC Mall AZ | $75.00 |
| Target T2169 Kannapolis NC | $4,524.00 |
| Target T1892 Raleigh NC | $39,066.00 |
| Target T2354 Phoenix SPCT AZ | $50,250.00 |
| Target T2365 Queen Creek AZ | $4,000.00 |
| Target T1180 Greensboro NC | $28,054.00 |
| Target T1872 Durham NC | $49,660.00 |
| Target T2011 Arden NC | $44,457.00 |
| Target T2227 Peoria AZ | $54,010.00 |
| Target T2111 Knightdale NC[1] | $28,971.00 |
| Target T1959 Gilbert Mesa AZ | $44,660.00 |
| Target T1386 Mesa Red AZ | $52,635.00 |
| Target T2090 Charlotte NC[2] | $61,630.48 |
| Target T3863 Add Cams & Cbl | $12,320.00 |

[1] In addition to Kane's outstanding invoices in the amount of $18,560.00, Kane has also submitted 179.5 hours for work performed at Target T2111, which CompuCom has not processed for invoicing.  At the agreed upon labor rate of $58.00, this equates to an additional $10,411.00.  Thus, the amount stated above, reflects the total amount due and owing to Kane for work performed at Target T2111.

[2] In addition to Kane's outstanding invoices in the amount of $37,545.98, Kane has also submitted 415.25 hours for work performed at Target T2090, which CompuCom has not processed for invoicing.  At the agreed upon labor rate of $58.00, this equates to an additional $24,084.50.  Thus, the amount stated above, reflects the total amount due and owing to Kane for work performed at Target T2090.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

Kane is not entitled to payment on the invoices reflected in Interrogatory No. 8, for multiple reasons. Kane materially breached its agreements with CompuCom by performing work that was defective, did not meet contractual standards, and/or did not satisfy industry standards of care. Further, CompuCom has withheld amounts otherwise due to Kane to offset damages CompuCom incurred based on Kane's defective work.

For further explanation, CompuCom refers Kane to CompuCom's Original Answer and Counterclaims (Dkt. 7); the expert report of Phil Isaak, dated February 21, 2024; and the letter from Semi Ferrante to Robert Lewis, dated January 10, 2023. Each of those documents elaborates and expands on CompuCom's reasoning for withholding payment on invoices submitted by Kane.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 9.
Please state with specificity and particularity the reason(s) Kane was terminated and provide and identify all notices and opportunity to cure issued to Kane.

**SPECIFIC OBJECTIONS:**
CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**
Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

CompuCom refers Kane to the letter from Semi Ferrante to Robert Lewis dated January 10, 2023, in which CompuCom notified Kane of termination of the contracts due to Kane's material breach and anticipatory repudiation of the contracts.

CompuCom provided Kane with notice and an opportunity to cure Kane's defective work on multiple occasions, in person and in writing, prior to January 2023. Those notices came through oral and written communications between CompuCom's and Kane's project managers at the Target stores. Kane representatives stated to CompuCom representatives in January 2023 that it could no longer evaluate, address, and cure its defective work due to personnel shortages.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the written communications between representatives of CompuCom and Kane, including emails between and among the parties' project managers and the January 10, 2023, letter from Semi Ferrante to Robert Lewis; CompuCom's Original Answer and Counterclaims (Dkt. 7); and the expert report of Phil Isaak, dated February 21, 2024.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 10.

Identify and describe with particularity and specificity any work performed by Kane on the Projects that CompuCom contends was incomplete and/or deficient and had to be completed or completely redone by others.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

A particular and specific accounting of Kane's incomplete and deficient work is not possible, because Kane materially breached its agreements with CompuCom by failing to consistently, systematically, and properly record Kane's completion of its tasks. For example, Kane repeatedly failed to complete documentation of tasks it performed, including (i) notating completion of the task in project management software and databases and/or reporting completion of the task by other means; and (ii) providing photographs or videos of the completed task.

CompuCom has documented as much of Kane's incomplete and deficient work as was possible, due to Kane's repeated failures to document the work it performed. Those failures were legion, far too numerous to list in response to an interrogatory. The expert report of Phil Isaak, dated February 21, 2024, contains an explanation of the broad categories of Kane's defective work, and where examples were found. Further, the Smartsheet database contains numerous examples of Kane's defective work (though not all instances, due to Kane's failure to properly document the work it attempted).

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

- 11 -

The answers to this interrogatory may be obtained by reviewing the Smartsheet database, to which Kane has been provided access; and the expert report of Phil Isaak, dated February 21, 2024. Those documents describe in detail Kane's incomplete and deficient work.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 11.

Identify any and all replacement subcontractors that CompuCom contends was hired to repair, replace and/or complete Kane's work. For each subcontractor, identify and describe with particularity and specificity the scope of work performed, the store at which such work was performed, and the price and/or cost associated with same.

**SPECIFIC OBJECTIONS:**

CompuCom objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

CompuCom hired the following replacement subcontractors to repair, replace, and/or complete Kane's work:

- IP Camera Solutions dba Hawkeye Technologies
- Chtech LLC
- Top Notch Communications, LLC

As to the particularity and specificity of the work performed by each replacement subcontractor, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the Smartsheet database, to which Kane has been provided access. The database contains copies of all invoices issued by the replacement subcontractors, as well as daily tech workbooks entries that describe the work the replacement subcontractors completed.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

- 12 -

## INTERROGATORY NO. 12.

Identify and describe with particularity and specificity any work performed by Kane on the Projects that CompuCom contends was defective and/or not in accordance with the Vendor Agreement and/or the SOWs. For each defect, state the applicable store, identify and provide any and all notices CompuCom provided Kane of the alleged deficiency, and the damage value incurred by CompuCom due to each deficiency item.

**SPECIFIC OBJECTIONS:**

CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

CompuCom further specifically objects to this interrogatory as duplicative of Interrogatory No. 10 and Interrogatory No. 11. CompuCom has already provided the information requested in this interrogatory in response to those other interrogatories.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

A particular and specific accounting of Kane's defective work (and work that was not in accordance with the Vendor Agreement and/or the SOWs) is not possible, because Kane materially breached its agreements with CompuCom by failing to consistently, systematically, and properly record Kane's completion of its tasks. For example, Kane repeatedly failed to complete documentation of tasks it performed, including (i) notating completion of the task in project management software and databases and/or reporting completion of the task by other means; and (ii) providing photographs or videos of the completed task.

CompuCom has documented as much of Kane's defective work as was possible, due to Kane's repeated failures to document the work it performed. Those failures were legion, far too numerous to list in response to an interrogatory. The expert report of Phil Isaak, dated February 21, 2024, contains an explanation of the broad categories of Kane's defective work, and where examples were found. Further, the Smartsheet database contains numerous examples of Kane's defective work (though not all instances, due to Kane's failure to properly document the work it attempted).

As to "the damage value incurred by CompuCom due to each deficiency item," the Smartsheet database, to which Kane has been provided access, contains copies of all invoices issued by the replacement subcontractors, as well as daily tech workbooks entries that describe the work the replacement subcontractors completed.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the Smartsheet database, to which Kane has been provided access; and the expert report of Phil Isaak, dated February 21, 2024. Those documents describe in detail Kane's defective work, and the amount of damages CompuCom incurred to address and correct that defective work.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 13.

Identify and describe with particularity and specificity any remedial and/or repair work that CompuCom contends was required as a result of Kane's allegedly defective work under the SOWs. For all remedial and/or repair work identified, state the applicable store, explain with specificity who performed the remedial and/or repair work, and the damage value incurred by CompuCom as a result thereof.

**SPECIFIC OBJECTIONS:**

CompuCom objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

CompuCom further specifically objects to this interrogatory as duplicative of Interrogatory No. 10, Interrogatory No. 11, and Interrogatory No. 12. CompuCom has already provided the information requested in this interrogatory in response to those other interrogatories.

**ANSWER:**

Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

First, a particular and specific accounting of Kane's defective work is not possible, because Kane materially breached its agreements with CompuCom by failing to consistently, systematically, and properly record Kane's completion of its tasks. For example, Kane repeatedly failed to complete documentation of tasks it performed, including (i) notating completion of the task in project management software and databases and/or reporting completion of the task by other means; and (ii) providing photographs or videos of the completed task.

CompuCom has documented as much of Kane's defective work as was possible, due to Kane's repeated failures to document the work it performed. Those failures were legion, far too numerous to list in response to an interrogatory. The expert report of Phil Isaak, dated February 21, 2024, contains an explanation of the broad categories of Kane's defective work, and where examples were found. Further, the Smartsheet database contains numerous examples of Kane's defective work (though not all instances, due to Kane's failure to properly document the work it attempted).

- 14 -

Second, as to the remedial and/or repair work required as a result of Kane's defective work, the Smartsheet database, to which Kane has been provided access, contains copies of all invoices issued by the replacement subcontractors, as well as daily tech workbooks entries that describe the work the replacement subcontractors completed.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the Smartsheet database, to which Kane has been provided access; and the expert report of Phil Isaak, dated February 21, 2024. Those documents describe in detail Kane's defective work, and the amount of damages CompuCom incurred to address and correct that defective work.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 14.

Identify and describe with particularity and specificity any work performed by Kane on the Projects under the SOWs that CompuCom rejected and/or refused to accept. For each, state the applicable store and explain why it was rejected, identify and provide all notices CompuCom provided Kane of the rejected work, and the damage value incurred by CompuCom as a result thereof.

### SPECIFIC OBJECTIONS:

CompuCom objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

CompuCom further specifically objects to this interrogatory as duplicative of Interrogatory No. 9. CompuCom has already provided at least some of the information requested in this interrogatory in response to that other interrogatory.

### ANSWER:

Subject to its objections to definitions and instructions and its specific objections, CompuCom responds as follows:

First, CompuCom rejected and/or refused to accept Kane's defective work on multiple occasions, in person and in writing. Those rejections and refusals came through oral and written communications between CompuCom's and Kane's project managers at the Target stores.

- 15 -

Second, as to the "damage value incurred by CompuCom as a result" of Kane's defective work that CompuCom was forced to reject, the Smartsheet database, to which Kane has been provided access, contains copies of all invoices issued by the replacement subcontractors, as well as daily tech workbooks entries that describe the work the replacement subcontractors completed.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the written communications between representatives of CompuCom and Kane, including emails between and among the parties' project managers and the January 10, 2023, letter from Semi Ferrante to Robert Lewis; CompuCom's Original Answer and Counterclaims (Dkt. 7); and the expert report of Phil Isaak, dated February 21, 2024.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.

## INTERROGATORY NO. 15.
Please provide an itemized breakdown of the damages that CompuCom claims in its Counterclaim.

**SPECIFIC OBJECTIONS:**
CompuCom specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**
Subject to its objections to definitions and instructions, and its specific objections, CompuCom responds as follows:

CompuCom has incurred multiple categories of damages, including:

- Increased cost that CompuCom was forced to pay replacement subcontractors to finish the work that Kane agreed to complete pursuant to the Vendor Agreement and SOWs, which is based on (i) the difference between Kane's agreed hourly rate for labor and the hourly rate for labor for the replacement vendor for certain Target stores and (ii) the number of hours remaining to complete the work at those stores, according to the original budget hours and any approved change orders, at the time Kane was terminated. The current estimated amount for this category of damages is $14,799.50.

- Cost of Re-Work, which is the amounts CompuCom was forced to pay to replacement subcontractors to re-do work that Kane represented it had completed by the time Kane was terminated. The current estimated amount for this category of damages is $557,014.00.

- Cost of Replacement Materials, which is the amount CompuCom was forced to spend to purchase additional materials for work at certain Target stores due to Kane's defective work, which is calculated based on (i) the difference between the materials charges incurred for the stores after Kane was terminated and (ii) the amount of approved change orders for materials after Kane was terminated. The current estimated amount for this category of damages is $18,673.54.

- Cost of Additional Lift Rentals, which is the amount CompuCom was forced to spend to rent additional lifts for work at certain Target stores due to Kane's defective work, which is calculated based on (i) the difference between the lift rental charges incurred for the stores after Kane was terminated and (ii) the amount of approved change orders for lift rentals after Kane was terminated. The current estimated amount for this category of damages is $20,478.00.

The total current estimated amount for all categories of damages is $610,965.04.

Discovery is ongoing. CompuCom reserves the right to supplement or amend this response.


**INTERROGATORY NO. 16.**
State and explain whether Kane's claim against you is subject to any credits, setoffs, deductions, or backcharges. For each such credit, setoff, deduction, or backcharge, state with particularity the amount and nature of each credit, setoff, deduction, or backcharge, the date that such cost was incurred, and the date and manner in which Kane was notified of each credit, setoff, deduction or backcharge.

**SPECIFIC OBJECTIONS:**
CompuCom specifically objects to this interrogatory as vague and ambiguous, because it is unclear what the phrase "subject to any credits, setoffs, deductions, or backcharges" means. CompuCom interprets this phrase to seek an explanation for CompuCom's refusal to pay amounts demanded by Kane.

CompuCom further specifically objects to this interrogatory to the extent it seeks to require CompuCom to marshal all of its available proof, or the proof it intends to offer at trial.

**ANSWER:**
Subject to its objections to definitions and instructions and its specific objections, CompuCom responds as follows:

- 17 -

36

To the extent Kane has billed for any work that was properly completed and not been paid for that work, CompuCom is withholding payment on such invoices to offset damages CompuCom incurred due to Kane's defective work, as is permitted by law and under the terms of the contracts between CompuCom and Kane.

To the extent Kane is seeking more information than that, CompuCom invokes Rule 33(d), because the answer to this interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing CompuCom's business records, and the burden of deriving or ascertaining the answer will be substantially the same for Kane as it is for CompuCom.

The answers to this interrogatory may be obtained by reviewing the written contracts between the parties (including the Vendor Agreement and the SOWs), as well as the January 10, 2023, letter from Semi Ferrante to Robert Lewis.

Discovery is ongoing.  CompuCom reserves the right to supplement or amend this response.

Docusign Envelope ID: 4F274826-9746-4967-A0AC-8FEB248EF9FC

**ERRATA SHEET**

| Page:Line(s) | Preceding Question | Recorded response | Revised response | Reason |
|---|---|---|---|---|
| 203:7–8 | "Yeah. So I want to know for the hours that are associated with the cost of rework, the underlying basis of that would be the Smartsheets that Hawkeye or Top-Notch submitted to rework stuff that Kane had already done; right?" | "Potentially, yes. Or it does not meet the—the acceptance criteria." | "Not really. The cost of re-work was calculated using the number of hours a replacement subcontractor like Hawkeye or Top Notch invoiced for a store, minus any hours for change orders initiated after Kane was terminated, minus any hours remaining in Kane's total budget, including Kane's change orders. That's Column Q, Rework by Replacement Sub (hours). And Column T, Cost of Rework, is Column Q, the number of re-work hours, multiplied by Column L, the replacement sub's hourly rate." | Correction |
| 203:17–18 | "So if I wanted to know what specific task 14 these replacement vendors reworked of Kane for that 15 store, I would have to go to Smartsheets and look at that; right?" | "Yes, but can you click on the T1386 real quick for me?" | "No. We could not determine what specific task these replacement vendors reworked for Kane for a store, because Kane did not maintain accurate records, in Smartsheet or elsewhere, of the work it attempted or actually completed. Can you click on the T1386 real quick for me?" | Correction |
| 204:1 | "So if I wanted to know what specific task 14 these replacement vendors reworked of Kane for that 15 store, I would have to go to Smartsheets and look at that; right?" | "No, we don't have the notes here. Okay, no. Understood. Yes, that would be in Smartsheets." | "No, we don't have the notes here. Okay, no. Understood. You cannot reliably tell from Smartsheets which tasks a replacement sub was completing, because Kane did not attempt the task, and which tasks the replacement sub is fixing because Kane did it incorrectly." | Correction |

Page **1** of **5**

Docusign Envelope ID: 4F274826-9746-4967-A0AC-8FEB248EF9FC

| Page:Line(s) | Preceding Question | Recorded response | Revised response | Reason |
|---|---|---|---|---|
| 204:13 | "So somewhere in the Smartsheets completed by 11 Hawkeye for this work, it would identify that Hawkeye is redoing work that Kane already did?" | "That's my understanding." | "No, not necessarily. Because we don't have complete and accurate records of the work Kane attempted or completed, we cannot reliably tell whether work a replacement sub did was to fix work Kane attempted, or to do work that was within the scope of work but which Kane never attempted." | Correction |
| 204:19 | Is that done through somebody going through all of the Smartsheets and making that determination? Or you just do it by time to say, "Well, Hawkeye got on this project T1386 on January 18, 2023, so all of their hours must be reworking Kane's?" | "No. I don't believe so." | "The number of hours a replacement sub spent reworking tasks Kane completed incorrectly is calculated in Column Q, and is based on the number of hours the replacement sub invoiced for a store, minus any hours for change orders initiated after Kane was terminated, minus any hours remaining in Kane's total budget, including Kane's change orders." | Correction |
| 212:16 | "But so no one had to go through Smartsheets and determine -- I see what he's doing by his description, that's rework, we just assume because the maximum amount of hours allowed equals a certain dollar figure, we're saying if it wasn't change order work which was adding to the | "No." | "Mostly correct. Most of the hours were typically rework hours. But some of the replacement sub's hours could have been to performed tasks within the original scope of work that Kane had not attempted by the time Kane was terminated." | Correction |

39

Docusign Envelope ID: 4F274826-9746-4967-A0AC-8FEB248EF9FC

| Page:Line(s) | Preceding Question | Recorded response | Revised response | Reason |
|---|---|---|---|---|
| | hours, here 1,621, then the additional hours worked by them had to be Hawkeye doing rework of Kane?" | | | |
| 212:19–25 | "Oh, I thought I had it. All right." | "Well, it's a good concept, right? But the rework by replacement sub is the total hours to complete that rework, and that supplier would have documented those hours correctly in Smartsheets. So basically when they finish the task, they, you know, once again, I don't know what the verbiage is that's in Smartsheets specifically, but they would have called out that this is a rework task." | "Yes, you have it." | Correction |
| 213:7–15 | "Yeah, I just wonder if the damages were derived just using math or if it was derived by analyzing the worksheets and saying, "I see the description of the work, so for those ten hours, that's rework, add that in, and eventually you'll get to | "No, that is not how that -- this was calculated at all. It was specific hours used for the rework plus the change orders gives us the total. So it's the reverse of that. Where you're thinking that you start with the total, we didn't start with the total. | "No, you were right. It's just math." | Correction |

Docusign Envelope ID: 4F274826-9746-4967-A0AC-8FEB248EF9FC

| Page:Line(s) | Preceding Question | Recorded response | Revised response | Reason |
|---|---|---|---|---|
| | 200.5 hours?'" | We started with we know how much the change orders are, and then we know how much the rework is. And those two equal the total." | | |
| 214:4–5 | "And so once you do that math of the total minus 1,621, you get 2,000.5, and we know that all of those hours then must be spent doing rework of Kane?'" | "So the way that you keep positioning that is opposite of what I'm saying." | "Almost. For that store, T1386, it's the total minus the remaining budget hours, which are 259.5, minus the change-order hours, which are 1621. That's how you get 2,000.5, which are the re-work hours." | Correction |
| 214:8–13 | "I know. I can't follow your way, so I keep saying that. I apologize." | "Well, everything -- so before you get to a total, you have to have a numbers first; right? So the numbers get built out. So in Smartsheets, we have the -- we know what the number of hours are for replacement -- for the replacement of the work; right? So the rework—" | "No, you were close." | Correction |
| 215:22 | "So if I wanted to test the accuracy of Hawkeye's bookkeeping, I could look at the Smartsheets that it | "Yes, that is my understanding." | "I believe you should be able to look at Smartsheet, and the number of hours described or recorded should match Hawkeye's invoice hours. But you won't | Correction |

Docusign Envelope ID: 4F274826-9746-4967-A0AC-8FEB248EF9FC

| Page:Line(s) | Preceding Question | Recorded response | Revised response | Reason |
|---|---|---|---|---|
| | submitted and I would be able to add that up to 2,000, as well?" | | necessarily be able to tell just from looking at Smartsheet how much of Hawkeye's time was spent reworking tasks performed by Kane. For the reasons we've discussed." | |

## ACKNOWLEDGEMENT OF DEPONENT

"I, Semi Ferrante, do hereby declare that I have read my deposition transcript dated December 13, 2024, I have made any corrections, additions, or changes I deemed necessary as noted above as noted above to be appended to that deposition transcript, and that the same is a true, correct and complete transcript of the testimony given by me.'"

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

Sumi Ferrante

2/5/2025

SEMI FERRANTE                    DATE

Page **5** of **5**

42

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KANE COMMUNICATIONS LLC, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| vs. | § | Civil No. No. 3:23-cv-00824-E |
| | § | |
| COMPUCOM SYSTEMS INC., | § | |
| | § | |
| *Defendant/Counter-Plaintiff.* | § | |

---

**COMPUCOM SYSTEMS, INC.'S THIRD AMENDED INITIAL DISCLOSURES**

---

Defendant / Counter-Plaintiff CompuCom Systems, Inc. serves its Third Amended Initial

Disclosures as required by Federal Rule of Civil Procedure 26(1)(A) and this Court's June 20,

2023, Order:

**(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Semi Ferrante** <br> c/o Julie Springer <br> jspringer@weisbartspringer.com <br> WEISBART SPRINGER STORM HATCHITT LLP <br> 212 Lavaca Street, Suite 200 <br> Austin, Texas 78701 <br> Tel. (512) 652-5780 | Mr. Ferrante is CompuCom's Senior Director, Strategic Sourcing. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. He also has knowledge regarding Kane's repudiation of the contracts. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Brenda Hanson**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Ms. Hanson is CompuCom's Managing Project Director. She has knowledge regarding Kane's performance under the contracts, Kane's defective work, communications with Kane regarding Kane's performance, approval and withholding of Kane's invoices, work done by vendors to remedy Kane's defective work, and amounts incurred as a result of Kane's failure to perform. |
| **Jaime Kingston**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Ms. Kingston is a CompuCom Senior Project Manager with oversight over the projects relevant to this dispute. She has knowledge regarding Kane's performance under the contracts, Kane's defective work, communications with Kane regarding Kane's performance, approval and withholding of Kane's invoices, work done by vendors to remedy Kane's defective work, and amounts incurred as a result of Kane's failure to perform. |
| **Mark Ness**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. Ness is a CompuCom Project Coordinator. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. |
| **Ron Benco**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. Benco is a CompuCom Project Manager. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Kenneth Janoski**<br>c/o Julie Springer<br>jspringer@wshllp.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. Janoski was a vice president of CompuCom. He executed the Statements of Work with Kane, and has knowledge regarding those agreements. |
| **Ron DeLand**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. DeLand is a CompuCom Project Manager. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. |
| **Sai Vang**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. Vang is a CompuCom Project Manager. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. |
| **Shane Phipps**<br>c/o Julie Springer<br>jspringer@weisbartspringer.com<br>WEISBART SPRINGER STORM HATCHITT LLP<br>212 Lavaca Street, Suite 200<br>Austin, Texas 78701<br>Tel. (512) 652-5780 | Mr. Phipps is CompuCom's PMO Operations. He has knowledge regarding the contracts between the parties, Kane's performance under the contracts, communications with Kane regarding Kane's performance, termination of the contracts, and amounts incurred as a result of Kane's failure to perform. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **CH Tech LLC**, and its employees, representatives, and custodians of records, including, but not limited to, Amber Hill and Charley Davis<br>amber.hill@chtechllc.us<br>Tel. (419) 310-4418<br>charleyd311@gmail.com | Employees and representatives of CH Tech LLC were retained to replace Kane as the low-voltage subcontractor at Target store T2090. They have knowledge regarding the state of Kane's work at T2090 when Kane was terminated in January 2023, and the work necessary to rework and/or finish the low-voltage tasks at T2090 after Kane was terminated. |
| **Hawkeye Technologies**, and its employees, representatives, and custodians of records including, but not limited to, John Adamski and Emilio Rodriguez<br>636 Ballyshannon Drive<br>Davenport, Florida 33897<br>jadamski@hawkeyetec.com<br>Tel. (404) 217-4900 | Employees and representatives of Hawkeye Technologies were retained to replace Kane as the low-voltage subcontractor at Target stores T1386, T1959, T2227, and T2354. They have knowledge regarding the state of Kane's work at T1386, T1959, T2227, and T2354 when Kane was terminated in January 2023, and the work necessary to rework and/or finish the low-voltage tasks at T1386, T1959, T2227, and T2354 after Kane was terminated. |
| **Top Notch Communications LLC**, and its employees, representatives, and custodians of records, including, but not limited to, Ray Surrett, John Wright, and Cody Robinson<br>1503 Laurel Avenue E<br>Greenwood, South Carolina 29649<br>Tel. (864) 389-4120<br>ray.surrett@tnc.expert | Employees and representatives of Top Notch Communications LLC were retained to replace Kane as the low-voltage subcontractor at Target stores T0961, T1807, T1872, T1892, and T2011. They have knowledge regarding the state of Kane's work at T0961, T1807, T1872, T1892, and T2011 when Kane was terminated in January 2023, and the work necessary to rework and/or finish the low-voltage tasks at T0961, T1807, T1872, T1892, and T2011 after Kane was terminated. |
| **Anistar Technologies, LLC**, and its employees, representatives, and custodians of records<br>c/o Marty Gallenstein<br>marty.gallenstein@nsc-tech.com<br>2002 N Lois Avenue, Suite 310<br>Tampa, Florida 33607<br>Tel. (813) 817-1998 | Employees and representatives of Anistar Technologies, LLC were hired by Kane as subcontractor(s) at Target stores T0961 and T1892. They have knowledge of the work they performed at Target stores T0961 and T1892. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Cable Solutions, LLC**, and its employees, representatives, and custodians of records, including but not limited to, Eartis Mincey, Emmanuel Nunez Alcala, Ismael Juarez, Jason Kitzmiller, Jonathan Andrade Figueroa, Joseph Garcia, Josiah Seamster, Julian Paiz, Matthew I. Steele, Michael Kowalczyk, Michael Ludig, Scott L. Mulka, Thomas Schulze, and Victor Ramirez<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Employees and representatives of Cable Solutions, LLC were hired by Kane as subcontractor(s) at Target stores T1386, T1439, T1863, T1959, T2227, T2354, and 2365. They have knowledge of the work they performed at Target stores T1386, T1439, T1863, T1959, T2227, T2354, and T2365. |
| **Industrial Staffing Services, Inc d/b/a FieldLink**, and its employees, representatives, and custodians of records, including but not limited to, Jessica-Lynn Marketta, Abril Short, Adrian Lopez, Andre Powell, Brian Stith, Carlos Sanchez, Christopher Hamrick, Erick Brown, Jose Cervantes, Justin Boone, Justin Oliver, Mario Montes, Mark Harris, Matthew Hamrick, Michael Jones, Sajjad Al Ani, Saul Gonzalez, and Spencer Hubble<br>c/o Steven M. Friedland<br>FREEDMAN & FRIEDLAND LLC<br>777 Terrace Avenue, Suite 508<br>Hasbrouck Heights, New Jersey 07604<br>Tel. (201) 288-7773<br>sfriedland@freedmanfriedland.com | Employees and representatives of Industrial Staffing Services, Inc d/b/a FieldLink were hired by Kane as subcontractor(s) at Target stores T1386, T1439, T1863, T2227, T2354, and T2365. They have knowledge of the work they performed at Target stores T1386, T1439, T1863, T2227, T2354, and T2365. |
| **Next Level Technician**, and its employees, representatives, and custodians of records<br>c/o Michael Cole<br>michael.cole@nextleveltechnician.com<br>PMB 228 750 HWY 160 W, Suite 101<br>Fort Mill, South Carolina 29708<br>Tel. (704) 405-7433 | Employees and representatives of Next Level Technician were hired by Kane as subcontractor(s) at Target stores T1892, T2011, T2090, T2111. They have knowledge of the work they performed at Target stores T1892, T2011, T2090, T2111. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Outsource Telecom, LLC**, and its employees, representatives, and custodians of records, including but not limited to, Reid Clevenger, Andres Lugo, Anthony Fuentes, Daniel Murray, Juan Burgueano, Marcus Mcgruder, Mark Leonard, Michael Osborne, and William Goldberg<br>c/o Smita Abraham<br>Director of Corporate Operations<br>711-A Campus Square<br>West, El Segundo, California 90245<br>Tel. (703) 636-0962 | Employees and representatives of Outsource Telecom, LLC were hired by Kane as subcontractor(s) at Target stores T1892, T1386, T1959, T2090, T2227, T2354, and T2365. They have knowledge of the work they performed at Target stores T1892, T1386, T1959, T2090, T2227, T2354, and T2365. |
| **Outsource Telecom, Inc.**, and its employees, representatives, and custodians of records<br>c/o Smita Abraham<br>Director of Corporate Operations<br>711-A Campus Square<br>West, El Segundo, California 90245<br>Tel. (703) 636-0962 | Employees and representatives of Outsource Telecom, LLC were hired by Kane as subcontractor(s) at Target stores T1892, T1386, T1959, T2090, T2227, T2354, and T2365. They have knowledge of the work they performed at Target stores T1892, T1386, T1959, T2090, T2227, T2354, and T2365. |
| **Premiere Communications & Consulting, LLC**, and its employees, representatives, and custodians of records, including but not limited to, Anthony Marmentini, Benje Vereen, Christopher Turner, Dalton Davidson, Drake Schill, Dylan Guibault, Jacob Kneer, Jalen Costic, Jason Martin, John Sain, Keagan Martin, Levi Mcconnell, Matthew Thomas, Michael Cotton, Nicolay Stepanov, Nolan Gray, Raanthony Sanders, Rex Booth, Wendell Everett, and Wesley Oquinn<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Employees and representatives of Premiere Communications & Consulting, LLC were hired by Kane as subcontractor(s) at Target stores T0961, T1807, T1892, T2011, T2090, T2111, and T2169. They have knowledge of the work they performed at Target stores T0961, T1807, T1892, T2011, T2090, T2111, and T2169. |

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **SitePro Solutions, Inc**, and its employees, representatives, and custodians of records, including but not limited to, Jason Gendron, Barrett Armstead, Christopher Coates, Danny Toscano, Michael Oconnor, Moamal Alabedy, And Trevor Watkins<br>c/o its registered agent for service of process<br>Paracorp Incorporated<br>176 Mine Lake Court, Suite 100<br>Raleigh, North Carolina 27615 | Employees and representatives of SitePro Solutions, Inc were hired by Kane as subcontractor(s) at Target stores 1386, 1439, 1959, 2227, 2354, and 2365. They have knowledge of the work they performed at Target stores 1386, 1439, 1959, 2227, 2354, and 2365. |
| **Verigent**, and its employees, representatives, and custodians of records<br>c/o Rebecca Hardin<br>rhardin@verigent.com<br>10115 Kincey Avenue, Suite 250<br>Huntersville, North Carolina 28078<br>Tel. (704) 658-3285 | Employees and representatives of Verigent were hired by Kane as subcontractor(s) at Target store T2011. They have knowledge of the work they performed at Target store T2011. |
| **Robert Lewis**<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>Conor G. Bateman<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Mr. Lewis is Kane's President. He has knowledge regarding Kane's performance under the contracts, communications with CompuCom regarding Kane's performance, and Kane's repudiation of the contracts. |
| **Angelo Romeo**<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>Conor G. Bateman<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Mr. Romeo is an employee of Kane. He has knowledge regarding Kane's performance under the contracts and communications with CompuCom regarding Kane's performance. |

49

| Name and Contact Information | Subjects of Discoverable Information |
|---|---|
| **Robert Buchholz**<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>Conor G. Bateman<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Mr. Buchholz is an employee of Kane. He has knowledge regarding Kane's performance under the contracts and communications with CompuCom regarding Kane's performance. |
| **Steve Radmann**<br>c/o Anderson Sessions<br>rasessions@cokinoslaw.com<br>Conor G. Bateman<br>COKINOS YOUNG, PC<br>One Galleria Tower<br>13355 Noel Road, Suite 1375<br>Dallas, Texas 75240<br>Tel. (817) 635-3600 | Mr. Radmann is an employee of Kane. He has knowledge regarding Kane's performance under the contracts and communications with CompuCom regarding Kane's performance. |

CompuCom reserves the right to supplement this response as discovery progresses.


**(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

CompuCom identifies the following categories of documents which it may use to support its claims and defenses, which are within its possession, custody, or control:

| Category of Document | Location |
|---|---|
| Contracts between CompuCom and Kane | CompuCom custodian of records |
| Communications between CompuCom and Kane, including communications regarding issues with Kane's work and termination of Kane | CompuCom custodian of records |
| Invoices, time sheets, and expense records for Kane's work under the contracts between CompuCom and Kane | CompuCom custodian of records |

| Invoices, time sheets, and expense records for vendors, supplies, and equipment to remedy and complete Kane's defective work | CompuCom custodian of records |
|---|---|
| Photographs, notes, and other documentary evidence of defects in Kane's work | CompuCom custodian of records |
| Project management data related to the project contained in "Smart Sheets" software | CompuCom custodian of records |
| Project-related documentation and instructions, including technical specifications, provided to Kane | CompuCom custodian of records |

In addition to the above-described documents, CompuCom may also rely on (i) publicly available documents, (ii) documents produced by Kane, and/or (iii) documents produced by third parties in this litigation.

CompuCom reserves the right to supplement this response as discovery progresses.

**(iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

CompuCom contracted with vendors at CompuCom's expense to remedy Kane's defective work and to complete the remaining work under the SOWs. CompuCom has incurred multiple categories of damages as a result, including:

- Increased cost that CompuCom was forced to pay replacement subcontractors to finish the work that Kane agreed to complete pursuant to the Vendor Agreement and SOWs, which is based on (i) the difference between Kane's agreed hourly rate for labor and the hourly rate for labor for the replacement vendor for certain Target stores and (ii) the number of hours remaining to complete the work at those stores, according to the original budget hours and any approved change orders, at the time Kane was terminated. The current estimated amount for this category of damages is $14,799.50.

- Cost of Re-Work, which is the amounts CompuCom was forced to pay to replacement subcontractors to re-do work that Kane represented it had completed by the time Kane was terminated. The current estimated amount for this category of damages is $557,014.00.

- Cost of Replacement Materials, which is the amount CompuCom was forced to spend to purchase additional materials for work at certain Target stores due to Kane's defective

- 9 -

work, which is calculated based on (i) the difference between the materials charges incurred for the stores after Kane was terminated and (ii) the amount of approved change orders for materials after Kane was terminated. The current estimated amount for this category of damages is $12,348.01.

- Cost of Additional Lift Rentals, which is the amount CompuCom was forced to spend to rent additional lifts for work at certain Target stores due to Kane's defective work, which is calculated based on (i) the difference between the lift rental charges incurred for the stores after Kane was terminated and (ii) the amount of approved change orders for lift rentals after Kane was terminated. The current estimated amount for this category of damages is $$20,478.00.

The total current estimated amount for all categories of damages is $604,639.51.

CompuCom is also entitled to recover its reasonable attorneys' fees under Section 38.001(8) of the Texas Civil Practice and Remedies Code and Section 12.11 of the Vendor Agreement between the Parties and seeks an award of the same.

CompuCom reserves the right to supplement or amend this response.


**(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

None.

Dated: April 18, 2025

Respectfully submitted,

WEISBART SPRINGER STORM HATCHITT LLP

_____

James C. Hatchitt
  State Bar No. 24072478
  jhatchitt@weisbartspringer.com
Julie A. Springer
  State Bar No. 18966770
  jspringer@weisbartspringer.com
Colleen Murphey
  State Bar No. 24102258
  cmurphey@weisbartspringer.com
212 Lavaca Street, Suite 200
Austin, Texas 78701
Tel. (512) 652-5780
Fax (512) 682-2074

William B. Mateja
  State Bar No. 13185350
  bmateja@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON
LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Tel. (469) 391-7400
Fax (469) 391-7401

*Attorneys for defendant/counter-plaintiff
CompuCom Systems, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on April 18, 2025, in accordance with Rule 5(b)(2) of the Federal Rules of Civil Procedure, to the parties listed and in the manner indicated below:

Anderson Sessions
rasessions@cokinoslaw.com
COKINOS YOUNG, PC
One Galleria Tower
13355 Noel Road, Suite 1375
Dallas, Texas 75240
Tel. (817) 635-3600

☐  Electronic service
☐  In person
☐  Registered mail, return receipt requested
☐  Commercial delivery service
☐  Facsimile
✓  Electronic mail

- 11 -

53

Fax (817) 635-3633

Shawn R. Farrell
sfarrell@cohenseglias.com
Matthew L. Erlanger
merlanger@cohenseglias.com
COHEN, SEGLIAS, PALLAS, GREENHALL
& FURMAN, PC
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
Tel. (215) 564-1700
Fax (215) 564-3066

*Attorneys for plaintiff/counter-defendant Kane
Communications LLC*

James Hatchitt

- 12 -

54

DocuSign Envelope ID: F9518CA2-32A3-40CD-98E8-AB441A918EFA

**compucom.**

January 10, 2023


Robert Lewis, President
Kane Communications LLC
572 Whitehead Road, Suite 201
Trenton, NJ 08619


RE:  Notice of Breach and Termination of Statements of Work for "Target – 2022 Store Remodel Install Flights 1-4 Q2108-34922" dated October 14, 2021 and "Target – 2022 Flight 5-8 Store Remodels" dated April 1, 2022 (the "SOWs") between Kane Communications LLC ("Kane") and CompuCom Systems, Inc. ("Compucom").


Dear Mr. Lewis,

This letter serves as Compucom's written notice of material breach of the above-referenced SOWs.  It also serves as notice of termination of the SOWs, and all Purchase Orders issued by Compucom pursuant to either or both SOWs, effective immediately.

As you and your company are aware from the parties' dealings, communications and reporting, including Smartsheets, over the course of performance of the SOWs, as well as from recent conversations with Compucom management, Kane has repeatedly failed to meet its obligations under the SOWs in numerous respects, as more specifically described below.  Kane's failures to meet its obligations include failing to complete the required work and deliverables for the customer sites listed in Exhibit A, all of which lack completion of one or more milestones or deliverables.

Further, Kane has advised Compucom that it is unable to perform any of the work that remains unfinished or requires remediation in the customer sites that remain incomplete.  Kane's past failures, each and in the aggregate, and Kane's repudiation of its remaining performance obligations constitute material breaches of the SOWs and the parties' Vendor Agreement and Master Statement of Work – Subcontracting Services dated March 24, 2017 (collectively, the "Vendor Agreement").

Termination.  Compucom hereby terminates the SOWs (a) on account of Kane's repudiation of its remaining performance obligations; (b) pursuant to Section 5.a.i. of each of the SOWs; (c) for multiple material breaches pursuant to Section 3.1.1(b) of the Vendor Agreement; and (d) for convenience pursuant to Section 3.1.1(a) of the Vendor Agreement.

Breaches by Kane.  The following is a non-exhaustive list of instances where Kane has breached the SOWs and the Vendor Agreement:

CompuCom Systems, Inc. • 8106 Calvin Hall Road, Fort Mill, South Carolina 29707
+1 (800) 268-2106 • +1 (803) 228-7400 • compucom.com

55

CompuCom 00048

**compucom.**

- Failure to complete the scopes of work required by the SOWs and/or performance of the work in a defective manner, including:
  - Deliverables and work (excluding work delayed by construction) that have not been started, that remain incomplete and/or have not been signed off by the customer;
  - Cabling done incorrectly and not in accordance with installation instructions and specifications for type of cable to be used;
  - Installation work that failed to pass the customer's inspection; and
    Work that was reported as complete but later discovered to have been performed incorrectly.

- Failure to provide requested staffing levels and charging for excess resources;

- Failure to provide weekly status reports as required by both SOWs Sec. 4.d.;

- Failure to provide additional installers as necessary to complete work and meet deadlines as required by both SOWs Sec. 4.h.; and

- Failure to provide qualified cabling technicians as required by both SOWs Sec. 4.o.i.;

Damages.  As a direct and proximate result of Kane's breaches, Compucom has incurred, and will continue to incur, damages and expenses, including costs required to complete and remediate the work in the SOWs that remains incomplete and/or defective, in amounts that cannot yet be determined as of the date of this letter.  Not only is Kane liable to Compucom pursuant to the terms of the Vendor Agreement, but Sec. 4.t.ii of both SOWs explicitly states that Kane is financially responsible to Compucom for it past and future failures to provide additional resources needed to complete the work on time.  Compucom hereby notifies Kane that it expects and will require payment and reimbursement for all such damages and expenses in an amount that remains to be determined.

Fees and Credits.  In accordance with the SOWs, certain fees and credits payable by Kane to Compucom have accrued based upon Kane's failures to abide by its performance obligations.  Compucom hereby notifies Kane that it expects and will require payment, reimbursement and credits, as applicable, from Kane for the following fees and credits, in a sum that will be tabulated by Compucom and provided to Kane in due course:

- Kane will pay a $500 per week penalty to Compucom for each week in which completion timelines for each required deliverable remain or remained incomplete pursuant to SOW Sec. 4.v.i.

- Kane will issue a $100 per day credit to Compucom for each day that Scope Sheets and Labor hours remained unposted into Smartsheets pursuant to SOW Sec. 4.v.viii.

Kane Invoices.  Kane has submitted numerous invoices to Compucom for work allegedly performed under the SOWs; Compucom is conducting a review and validation of the charges contained in all Kane invoices and hereby disputes all invoices submitted by Kane under these SOWs.  Many of these invoices contain inaccuracies and errors and/or were submitted late or otherwise not in compliance with the terms of the SOWs and the Vendor Agreement.  To the extent any of the amounts invoiced by Kane are valid charges that are in accordance with the

CompuCom Systems, Inc. • 8106 Calvin Hall Road, Fort Mill, South Carolina 29707
+1 (800) 268-2106 • +1 (803) 228-7400 • compucom.com

56

CompuCom 00049

DocuSign Envelope ID: F9518CA2-32A3-40CD-98E8-AB441A918EFA

**compucom.**

SOWs and the Vendor Agreement, Compucom claims an offset against such amounts, and to any other amounts that are or may become due and payable by Compucom to Kane, for the fees and credits owed to Compucom by Kane under the SOWs as well as the damages that have been and will be incurred by Compucom, including the fees and expenses that must be paid by Compucom to other vendors to complete and remedy work at customer sites, as a direct result of Kane's breaches in an amount equal to or greater than the amount of such invoices.

This letter is sent without prejudice to all of CompuCom's rights, remedies, claims, and defenses, all of which are specifically reserved.

Sincerely,

**CompuCom Systems, Inc.**



By:    Semi Ferrante, Sr. Director, Strategic Sourcing

CompuCom Systems, Inc. • 8106 Calvin Hall Road, Fort Mill, South Carolina 29707
+1 (800) 268-2106 • +1 (803) 228-7400 • compucom.com

57

**compucom.**

EXHIBIT A

| Store# | Location |
|--------|----------|
| T1386 | Mesa, AZ |
| T1807 | Asheville, NC |
| T1872 | Durham, NC |
| T1890 | Hyattsville, MD |
| T1892 | Raleigh, NC |
| T1959 | Mesa, AZ |
| T2011 | Arden, NC |
| T2090 | Charlotte, NC |
| T2227 | Peoria, AZ |
| T2354 | Phoenix, AZ |

CompuCom Systems, Inc. • 8106 Calvin Hall Road, Fort Mill, South Carolina 29707
+1 (800) 268-2106 • +1 (803) 228-7400 • compucom.com

58

CompuCom 00051

United States District Court

Northern District of Texas

Dallas Division

| |
|---|
| KANE COMMUNICATIONS, LLC |
| Plaintiff, |
| v. |
| COMPUCOM SYSTEMS, INC. |
| Defendant. |

Case No. 3:23-cv-00824-E

Amended Expert Report of Phil Isaak

May 28, 2024

_____

Philip J. Isaak, PE, P.Eng., DCDC, RCDD
Signed May 28, 2024

Isaak Technologies, Inc.
IsaakTech Project No. 23514.001

# Contents

1   INTRODUCTION ...................................................................................................... 5

1.1   Scope of Assignment ........................................................................................ 5

1.2   Parties ............................................................................................................... 5

    1.2.1   Plaintiffs ................................................................................................... 5

    1.2.2   Defendants ............................................................................................... 6

1.3   Parties not in Dispute ....................................................................................... 6

    1.3.1   Target Corporation .................................................................................. 6

1.4   Summary of Opinions: ...................................................................................... 6

1.5   Expert Qualifications ........................................................................................ 9

1.6   Information Considered .................................................................................. 10

2   LEGAL STANDARDS ............................................................................................11

3   METHODOLOGY ..................................................................................................11

4   INDUSTRY OVERVIEW .......................................................................................12

4.1   What is a Standard? ........................................................................................ 12

    4.1.1   De facto vs De jure Standards ............................................................... 12

4.2   Who develops Standards ................................................................................ 13

4.3   Network Cabling Standard Industry .............................................................. 15

    4.3.1   IEEE ......................................................................................................... 16

    4.3.2   TIA ........................................................................................................... 16

    4.3.3   BICSI ........................................................................................................ 17

4.4   What is a Building Code? ................................................................................ 21

4.5    Electrical Building Codes ................................................................ 22

    4.5.1    NFPA ........................................................................................ 22

**5    MILESTONE DATES ...................................................................24**

**6    TARGET STORES and REWORK CONTRACTORS .......................................25**

**7    ANALYSIS ...........................................................................26**

7.1    Compliance with industry specifications, codes and Target's installation standards................................................................................ 26

7.2    Identify required modifications ................................................... 27

    7.2.1    Kane Deliverables................................................................ 28

7.3    Pictures of Completed Work ...................................................... 28

    7.3.1    Target Requirements ......................................................... 28

    7.3.2    Kane Deficient Deliverables .............................................. 29

7.4    Cable Testing ........................................................................ 30

    7.4.1    Target Requirements ......................................................... 30

    7.4.2    BICSI ITSIMM Requirements .............................................. 34

    7.4.3    ANSI/TIA-568-C.2 Requirements ....................................... 35

    7.4.4    Kane Deficient Deliverables .............................................. 47

7.5    Utilize qualified technicians ...................................................... 50

7.6    Cabling Support Systems .......................................................... 51

    7.6.1    NFPA 70 Code Requirements ............................................ 51

    7.6.2    BICSI TDMM Specifications ............................................... 52

    7.6.3    BICSI ITSIMM ................................................................... 53

    7.6.4    Target Specifications ........................................................ 54

    7.6.5    Kane Deficient Deliverables .............................................. 59

7.7    Cable Routing ........................................................................ 60

    7.7.1    BICSI ITSIMM Requirements .............................................. 60

    7.7.2    Target Specifications ........................................................ 61

    7.7.3   Kane Deficient Deliverables ........................................................................ 64

7.8  Cable Service Loops ................................................................................................ 66

    7.8.1   Target Specifications ................................................................................ 66

    7.8.2   Kane Deficient Deliverables ........................................................................ 68

7.9  Vertical Drops and Cable Waterfalls ...................................................................... 70

    7.9.1   Target Specifications ................................................................................ 70

    7.9.2   Kane Deficient Deliverables ........................................................................ 74

7.10  Labeling ................................................................................................................ 75

    7.10.1  BICSI ITSIMM Specifications ....................................................................... 75

    7.10.2  Target Specifications ................................................................................ 76

    7.10.3  Kane Deficient Deliverables ....................................................................... 80

7.11  Coordination of Cabling with Hardware ............................................................... 85

    7.11.1  EAS Pedestal Network Drop ....................................................................... 85

    7.11.2  Remodels TV Wall/Valley Guide ................................................................ 88

7.12  Project Management ............................................................................................. 89

    7.12.1  Daily Tech Workbook Documentation ....................................................... 89

    7.12.2  Summary of Kane's DTWB Entires ............................................................ 93

# 1    INTRODUCTION

## 1.1    Scope of Assignment

I have been retained by Weisbart, Springer, Hayes, LLP, on behalf of defendant CompuCom Systems, Inc., to conduct analyses and to provide expert testimony regarding certain claims in this matter. Specifically, for this report I have been asked to review the Plaintiff Kane Communications, LLC's claims and opine whether Plaintiff's processes were consistent with their contractual requirements with Defendant, consistent with regulations and codes, and consistent with industry standards.

## 1.2    Parties

### 1.2.1    Plaintiffs

#### 1.2.1.1    Kane Communications, LLC

Kane Communications ("Kane") is a New Jersey LLC with a regional office located at 572 Whitehead Road, Ste. 201, Trenton, NJ 08619.[1,2] Kane indicates it "can provide clients with rapid and sustainable coverage regardless of location. We use highly trained technicians combined with the latest equipment, tools & technology to address all of your infrastructure needs. Kane is a member of UTCA, ACCNJ, 24X7 Exchange, & BICSI.  Kane [employs] BICSI – RCDD, RTPM Estimators/Project Managers, and Certified Technicians."[3]

---

[1] Plaintiff Kane Communications, LLC's Original Complaint, April 19, 2023, § II, ¶ 2.
[2] "Who We Are", Kane, https://kane.com/about-us/, accessed January 2024.
[3] "Who We Are", Kane, https://kane.com/about-us/, accessed January 2024.

### 1.2.2    Defendants

#### 1.2.2.1    CompuCom Systems, Inc.

CompuCom Systems, Inc. ("CompuCom") is a Delaware corporation with headquartered located at 8106 Calvin Hill Rd., Fort Mill, South Carolina 29707.[4] CompuCom indicates it "deliver[s] experience-enhancing solutions that power today's digital workplace, with everything you need for real-time collaboration, connection, and support."

### 1.3    Parties not in Dispute

#### 1.3.1    Target Corporation

Target Corporation ("Target") hired CompuCom to provide information technology outsourcing services for technology used in Target's business operations and facilities.  CompuCom in turn contracted with Kane to provide those services at a number of Target stores around the country.

### 1.4    Summary of Opinions:

Based on my experience and analysis, it is my opinion that:

ı    Kane technicians did not follow the installation methods specified within the guidelines provided by Target.

ı    Kane did not provide the required pictures of all completed work, as specified by Target.

ı    Kane's work did not meet code requirements due to installations not installed in a neat and workmanlike manner, cables and conductors installed exposed on the surface of ceilings and sidewalls not supported by the building structure in such a manner that the

---

[4] Plaintiff Kane Communications, LLC's Original Complaint, April 19, 2023, § II, ¶ 3.

Amended Expert Report of Phil Isaak                                                          May 28, 2024

Case No. 3:23-cv-00824-E                                                                            p. 6

cable will not be damaged by normal building use, cables not supported by straps, staples, hangers, cable ties, or similar fittings designed and installed so as not to damage the cable.

ı Kane's work did not comply with installation practices defined in BICSI cabling industry manuals, such as BICSI TDMM and BICSI ITSIMM, as specified by CompuCom in the Statement of Work.

ı Kane did not submit cable test results that complied with ANSI/TIA-568-C.2 as specified by Target. The incomplete, and inadequate, test results that Kane did submit for T0961 included cables that failed, with no follow-up test indicating the failed cable was corrected.

ı Kane did not provide the cable support systems as specified by industry standards and Target, or comply with building codes.

ı Kane did not route the cables as specified by industry standards and Target.

ı Kane did not install service loops as specified by Target.

ı Kane did not install waterfalls for vertical drops in cables, as specified by Target.

ı Kane did not provide labeling as specified by industry standards and Target.

ı Kane's work did not comply with installation practices specified by Target in their:

   o Store Structured Cabling Installation Requirements Implementation Document,

   o Remodel Stores Cabling Manual, and

   o numerous Installation Guides published for specific hardware.

ı The quality of the work performed by Kane was unacceptable with numerous examples of poor workmanship, and Kane failed to follow basic installation instructions provided to them. The inadequate performance of Kane warranted terminating its contract.

ı Kane's entries with respect to tasks completed within the Daily Tech Workbooks cannot be considered an accurate representation of tasks completed or tasks remaining open. Kane's DTWB's include task entries Kane identified as 100% completed that were not 100% completed.  Further, other task entries do not indicate any work was completed,

but there appears to have been some work completed for the task (albeit incorrectly and not per Code, industry standards or Target specifications).

ï Kane consistently exceeded the hours allocated for their scope of work.  By way of example, Kane used 143% of the budgeted hours across all the stores at which it worked.

ï CompuCom incurred additional costs to have other contractors complete the statement of work tasks assigned to Kane for at least eight Target stores. The eight stores were:

- o T1386
- o T1807
- o T1872
- o T1959
- o T2011
- o T2090
- o T2227
- o T2354

CompuCom incurred additional costs to have CH Tech, Top Notch and Hawkeye contractors perform work that was not completed by Kane, or rework tasks that were assigned to Kane but not completed correctly.

ï In my opinion, the deficiencies noted above exceeds the level of incompetence to justify CompuCom terminating their contract with Kane.

ï In addition to the eight Target stores noted above, in my review of Kane's DTWB there is also deficient work performed by Kane in stores that CompuCom has not claimed damages. These stores include:

- o T0961
- o T1180
- o T1439
- o T2037
- o T2169
- o T2365

As of the time of submitting this report, I did not have access to Kane's DTWB for stores T1890 or T1892. To the extent the DTWB for these stores later becomes available, I reserve the right to supplement my opinions.

Amended Expert Report of Phil Isaak                    May 28, 2024

Case No. 3:23-cv-00824-E                                        p. 8

It is my recommendation that CompuCom conduct a survey of the stores listed above to determine if additional rework is required.

### 1.5  Expert Qualifications

I am a Senior Engineer and President of Isaak Technologies, Inc ("IsaakTech"). I provide consulting services to a variety of clients. These services are concentrated in the data center and network infrastructure industries. My clients include individuals and organizations located in 28 countries and territories across 6 continents. Since 1996, I have provided data center and network infrastructure design and operations consulting services. Since 2011 my consulting services have also included data center and network infrastructure design and operations training to building owners, architects, engineers and construction professionals, data center and network infrastructure directors, managers, operators, IT system architects and administrators, and vendors who manufacture or distribute products used within the data center and network infrastructure industries.

In addition to completing my Engineering degree in 1996 and subsequently becoming a Professional Engineer, I also became certified as a Data Center Design Consultant (DCDC) in 2011 and a Registered Communications Distribution Designer (RCDD) in 1997 from the Building Industry Consulting Service International (BICSI) organization.

My curriculum vitae and a list of publications and presentations are included in Exhibit 1 to this report.

Attached as Exhibit 2 to this report is a list of cases in which I have provided an expert opinion, issued an expert report, or testified as an expert at trial, arbitration or by deposition.

I am being compensated at an hourly rate of $400 for my time on this case. All fees are paid to Isaak Technologies, Inc. by defendant's counsel. Neither my nor Isaak Technologies, Inc.'s compensation is dependent on the outcome of this matter or my conclusions.

1.6    Information Considered

Exhibit 3 to this report contains a listing of the documents and information I considered in preparing this report. This includes information produced in the discovery process in this case, as well as publicly-available information, information regarding the parties-in-suit, industry publications, presentations, vendor product information, and discussions with CompuCom.

My opinions in this report are based on the currently-available documents and information submitted to me for this purpose. I reserve the right to supplement or amend this report and my opinions based on any additional reports and opinions provided by experts for Plaintiff, including any rebuttal to this report, as well as any documents or information produced after the date of this report or any combination thereof that post-date the close of discovery.

In connection with any anticipated trial testimony in this action, I may use documents produced in this litigation that refer to, or relate to, the matters discussed in this report. Although I may cite to a particular page or pages of documents within this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant in my determination of claims in this matter. In addition, I may create or assist in the creation of certain demonstrative schedules, charts, graphs, tables, photos and timelines to assist me in testifying. To date, I have yet to create such demonstratives.